ANTIGO CO-OP CREDIT UNION, Appellant-Plaintiff, v. MILLER, Respondent-Defendant and Third Party Plaintiff: SPARKS, a/k/a Peggy Sparkes Lazy Acres Appy Ranch, Route 2–Box 12–B, Junction City, Wisconsin 54443, Respondent-Third Party Defendant.

Supreme Court

*No. 76–231. Argued October 30, 1978.—*
*Decided November 28, 1978.*
(Also reported in 271 N.W.2d 642.)

For the appellant there was a brief and oral argument by *Rex M. Smith* of Antigo.

For the respondent there was a brief by *Richard J. Heitman* and *Rice & Abbott* and oral argument by *Richard J. Heitman* of Sparta.

HEFFERNAN, J. The principal issue presented on this appeal is whether a buyer in the ordinary course of business takes free of a security interest when the secured party did not know that the seller was in the business of selling goods of the kind which constituted the collateral. We conclude that a buyer under those circumstances takes free of the security interest even though that security interest is perfected by proper execution and filing of a financing statement.

An important question to be resolved under the facts of this case is whether the buyer, James L. Miller, purchased the horse trailer from Peggy Sparks in the ordinary course of business. The trial court found that the purchase was in the ordinary course of business. We conclude that this finding was not contrary to the great weight and clear preponderance of the evidence.

Peggy Sparks purchased a horse trailer from Walter Hoffmeister. Her purchase from Hoffmeister was financed by the Antigo Co-op Credit Union. She picked up the trailer from Hoffmeister on May 7, 1974, and on that date she made application to the Antigo Co-op Credit Union for amendment of a security agreement entered into in November of 1973. The purpose of her application was to substitute as collateral the trailer received from Hoffmeister in May of 1974 for the trailer financed in the previous November and which she had sold.

On May 18, 1974, Peggy Sparks displayed the trailer at a horse show. James L. Miller saw the "for sale" sign on

the trailer, looked it over, and eventually bought the trailer from Sparks on July 2, 1974. The sum of $2,700 was paid by Miller to Sparks for the trailer.

Sparks failed to pay Antigo Co-op Credit Union. Because of Sparks' default, Antigo brought a replevin action against Miller, claiming that the trailer was subject to Antigo's perfected security interest. Miller answered, denying any knowledge of the prior security interest and asked for the dismissal of the plaintiff's complaint.

At trial, the defendant urged two defenses, (1) that Antigo did not have a perfected security interest, because the financing statement was filed in the office of the Register of Deeds of Portage county instead of in the office of the Secretary of State; and (2) that purchase of the trailer was in the ordinary course of business; and, hence, even were the security interest perfected by proper filing, Miller took free of the security interest.

The trial court in its memorandum decision accepted the latter defense and concluded, on the basis of the evidence, that the purchase was in the ordinary course of business and that it was irrelevant under that finding whether Antigo had a perfected security interest. The court ordered the dismissal of the complaint. We conclude that the trial court was correct in its findings of fact and in its application of the law to those facts.

Sections 409.307(1) and 401.201(9), Stats., are controlling.

Sec. 409.307(1), Stats., provides:

"409.307  **Protection of buyers of goods**
"(1) A buyer in ordinary course of business (s. 401.201(9)) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

A buyer in the ordinary course of business is defined in sec. 401.201 (9), Stats., as follows:

"(9) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a 3rd party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. All persons who sell minerals or the like (including oil and gas) at wellhead or minehead shall be deemed to be persons in the business of selling goods of that kind. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt."

Under these statutes, Miller, if a buyer in the ordinary course of business, takes free of Antigo's prior security interest, and the horse trailer is not subject to replevin.

Sec. 409.307 (1), Stats., applies to both perfected and unperfected security interests in circumstances where the buyer is in the ordinary course of business. Skilton, *Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code,* 1974 Wis. L. Rev. 1, 12. Because we reach the conclusion that the trial court's finding that Miller was a buyer in the ordinary course of business is not contrary to the great weight and clear preponderance of the evidence, we have no reason to determine whether or not Antigo's security interest was perfected.

Whether a buyer buys in the ordinary course of business is a mixed question of law and fact, but as Skilton, *supra,* at 31, points out, the principal question, and the question here, is factual and is a matter of the applica-

tion of the facts found to the law as set forth in the Uniform Commercial Code.

The trial court determined from the facts that Miller had made the purchase in good faith without knowledge that the sale to him was in violation of the ownership rights or security rights of Antigo.

It was undisputed that Miller knew nothing of Antigo's prior security interest.

The only contested factual issue was whether Peggy Sparks, at the time Miller bought the horse trailer, was "in the business of selling goods of that kind." In the trial court's memorandum decision, the court made the finding that, prior to Miller's purchase, Sparks showed the trailer at a horse show and advertised it for sale. The court also found that there was another new trailer on Peggy Sparks' farm on the date of the sale. It found that Sparks bought trailers from Hoffmeister with the intent of reselling them. It found that she carried trailer parts for resale and color charts, which were provided by Hoffmeister. When she conveyed the trailer to Miller, she did so by the means of a "Sales and Production Order," which had been furnished her by Hoffmeister. She signed the sales instrument on the line provided for the dealer's signature. In addition to having a new trailer on the premises on the date she sold the trailer to Miller, the court found that she had sold another trailer immediately before she purchased the trailer eventually sold to Miller.

These skeletal findings are supported and amplified by the testimony. Miller testified that another "brand" new horse trailer was on Peggy Sparks' premises when he picked up the one he purchased. Peggy Sparks testified that she had bought and sold several horse trailers, only two of which were financed through Antigo Co-op Credit Union. She stated that she sold horse trailers for

Walter Hoffmeister and recounted that her arrangement to sell for Hoffmeister commenced in 1973.[1]

The arrangement with Hoffmeister was that she could take one trailer at a time and, when she sold it, she would pick up another one from him. She also testified that she picked up a pack of sales forms, color charts, and parts lists to facilitate the sales she might make. She testified that she kept a small stock of spare parts for the trailers, and when her spare parts stock got low, she would buy more. Although she specifically stated she did not have a "dealership" for the sale of trailers, this was because a dealership agreement with the manufacturer required a deposit of $4,000.

On cross-examination, counsel for Antigo Co-op Credit Union questioned Peggy Sparks:

"*Q.* [F]rom what you have said that you were buying a trailer showing it to people when you went to these horse shows and if they were interested, why, you found yourself a deal for Mr. Hoffmeister, is that about it?
"*A.* Right. I was kind of like a middleman.
". . .
"*Q.* You simply got one from Mr. Hoffmeister and if you were able to find a buyer for that, well, then you got another one from him, is that right?
"*A.* Right.
"*Q.* Actually, you were kind of getting around the dealership laws a little bit, weren't you?
"*A.* Yes. Well, I didn't have the money for a dealership."

[1] Although Sparks testified the arrangement commenced in November of 1974, it is apparent that the date was clearly erroneous. The horse trailer involved in this action and a previous horse trailer were obtained from Hoffmeister prior to that date. The sale to Miller was on July 2, 1974. Because it is undisputed that the original financing agreement with Antigo Co-op Credit Union was dated November 1973, it is unmistakable that the course of dealings with Hoffmeister started in 1973 and not in 1974.

Given this evidence recounted above, it cannot be said that the trial court's finding that Peggy Sparks was in the business of selling horse trailers is contrary to the great weight and clear preponderance of the evidence. Whether she was a "dealer" in the sense that she had a manufacturer's franchise to sell is irrelevant. She was in the business of selling trailers. It is thus apparent, under the facts, that the application of sec. 409.307(1), Stats., requires the conclusion that Miller, a buyer in the ordinary course of business, took the horse trailer free of any security interest of Antigo Co-op Credit Union.

Antigo asserts, however, that, even though Miller was a buyer in good faith in the ordinary course of business, Antigo was ignorant of the fact that Sparks was in the business of selling trailers. It contends, therefore, that its security interest would be subordinate to the rights of Miller only if it knew, or should have known, that Peggy Sparks was in the business of selling trailers.

We conclude that the knowledge or lack of knowledge, whether actual or constructive, of a security holder is immaterial to the rights of a buyer in the ordinary course of business. The language of sec. 409.307(1), Stats., makes apparent that the knowledge of the secured party is not relevant, although the knowledge of the buyer is. Neither sec. 409.307(1) nor sec. 401.201(9) makes reference to the knowledge of the secured party.

The status of a buyer in the ordinary course of business does not depend on what the secured party knew. There is evidence of record that Sparks told Antigo that she intended to sell these trailers. Antigo denied having received that information. The trial court found, however, that Antigo had no knowledge that Peggy Sparks was in the business of selling trailers. That finding is not contrary to the great weight and clear preponderance of

the evidence; but in view of the provisions of secs. 409.-307(1) and 401.201(9), that lack of knowledge is of no consequence.

Antigo Co-op Credit Union's reliance upon *Savage v. Pratt*, 272 Wis. 170, 74 N.W.2d 635 (1956), a pre-U.C.C. case, is misplaced. That case interpreted a provision of the Uniform Conditional Sales Act, which by its very terms imposed a requirement of express or implied consent by the secured party to a resale for a buyer in the ordinary course to prevail over the rights of the original seller.[2] In the Uniform Commercial Code, however, sec. 409.307(1), Stats., does not require the consent of the security holder. Sec. 122.09 of the Uniform Conditional Sales Act is more properly the predecessor of sec. 409.-306(2)[3] of the Uniform Commercial Code, which in effect provides that a transferee who is *not* a buyer in the ordinary course of business will prevail over a secured party if resale is authorized.

Public policy considerations, which underlie the Uniform Commercial Code, also lead to the rejection of Antigo's argument that a buyer in ordinary course should not take free of a security agreement created by its sell-

---

[2] Sec. 122.09, Stats. 1955, provided:

"When goods are delivered under a conditional sales contract and the seller expressly or impliedly consents that the buyer may resell them prior to performance of the condition, the reservation of property shall be void against purchasers from the buyer for value in the ordinary course of business, and as to them the buyer shall be deemed the owner of the goods, even though the contract or a copy thereof shall be filed according to the provisions of this chapter."

[3] Sec. 409.306(2), Stats., provides:

"(2) Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

er unless the secured party knows its debtor is in the business of selling goods. *See*, Braucher and Riegert, *Introduction to Commercial Transactions* 454–56 (1977), and White and Summers, *Handbook of the Law Under the Uniform Commercial Code* 938 (1972).

Article 9 of the Uniform Commercial Code is not designed to reward a secured party for its ignorance of the business of its debtor. The philosophy of the Uniform Commercial Code is that it is more reasonable to expect a secured party to investigate its debtor's business than to impose such a duty on a good-faith consumer. The purpose of sec. 307(1) of Article 9 (sec. 409.307(1), Stats.) is to protect consumers. *See, Cunningham v. Camelot Motors, Inc.* (N.J. Super. 1975), 18 U.C.C. Reports 1068, 1071. As Skilton, *supra* at 3–4, points out:

> "Protecting a buyer who takes in an unauthorized sale but who is a buyer in ordinary course of business rests on principles of justice and utility. The collateral involved, the inventory, is of such kind that the debtor's ability to dispose of it in the usual course of business may be important so that he may continue his business as a going concern, and, let us hope, pay his indebtedness to the secured party. . . .
> "Further, there may be simple public policy favoring the safeguarding of sales transactions over the safeguarding of secured transactions . . . ."

The fact that in this case Antigo Co-op Credit Union financed Peggy Sparks without knowing her ordinary course of business was selling horse trailers, does not change the law's basic policy to protect the consumer. Antigo properly must bear the burden of failing to investigate its debtor.

Additionally, on this appeal, Antigo objects to the admission at trial of the following statement by Miller in response to the question:

> "*Q.* Did Peggy Sparks at any time tell you that she was a dealer in horse trailers?

"*A.* She said that she was pulling this trailer as a demonstrator model at the time and I had presumed that she'd been a dealer in the Trailett Company."

Antigo argues that this testimony created a legal presumption that Miller was a buyer in the ordinary course of business. The argument is far-fetched. What a witness presumes to be a fact does not make it even arguably a presumption in an evidentiary sense. Whether or not Miller believed Sparks was a dealer was irrelevant, for sec. 409.307 (1), Stats., has no such requirement and no reference to whether or not the buyer had knowledge that the seller is in "business." A buyer who bought from someone not in the business of selling goods of the kind but mistakenly believed that the seller was in such business would not, under the Code, qualify as a buyer in the ordinary course. The testimony of Miller was, however, admissible and probative in determining Miller's good faith, in that he believed, whether rightly or wrongly, that Peggy Sparks was a dealer; but his belief has nothing to do with proof of the fact that her ordinary course of business was the selling of horse trailers. That finding must rest, and it does, upon other facts of record upon which the trial court made its findings.

We accordingly conclude that the trial court's finding that Peggy Sparks was selling in the ordinary course of business when she sold the horse trailer to Miller, a buyer in good faith, is not contrary to the great weight and clear preponderance of the evidence. As a buyer in the ordinary course of business, Miller takes free and clear of Antigo Co-op Credit Union's security interest, whether or not that interest was perfected. The complaint was properly dismissed.

*By the Court.*—Order affirmed.