Maurice SHACKET and Sylvia Shacket, Plaintiffs,

v.

ROGER SMITH AIRCRAFT SALES, INC. et al., Defendants.

PHILKO AVIATION, INC., Counter–Plaintiffs,

v.

Maurice SHACKET et al., Counter–Defendants.

SANDWICH STATE BANK, Counter–Plaintiff,

v.

Maurice SHACKET et al., Counter–Defendants.

No. 78 C 4284.

United States District Court, N. D. Illinois, E. D.

Sept. 22, 1980.

James C. Murray, Jr., Katten, Muchin, Gitles, Zavis, Pearl & Galler, Chicago, Ill., for plaintiffs.

John N. Dore, Leslie R. Bishop, Bishop & Crawford, Oak Brook, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action involves a dispute over the ownership of a Piper Navajo airplane sold twice by defendants Roger Smith ("Smith") and Roger Smith Aircraft Sales, Inc. ("Smith Aircraft").[1] Plaintiffs Maurice and Sylvia Shacket ("Shackets"[2]) are in possession of the plane and have asked this Court in Count I for a declaratory judgment that they own the plane free of any claims of defendants. Defendant Philko Aviation Company ("Philko") has counterclaimed asserting its ownership of the plane. Defendant Bank has claimed a lien if the plane is owned by Philko. Shackets have also alleged in Complaint Count II that Philko aided Smiths in seeking to defraud Shackets of their interest in the plane and that all defendants have engaged in fraudulent conversion. Counterclaims have been filed by Philko and Bank.

Shackets and Philko have filed cross–motions for summary judgment on Count I, and Philko and defendant Edward McArdle ("McArdle"), its president and principal shareholder (through a holding company), have moved for summary judgment on Count II. For the reasons stated in this memorandum opinion and order, Shackets' motion for summary judgment as to Count I is granted (and Philko's is denied), and the Philko–McArdle motion for summary judgment as to Count II is also granted.

---

1. Throughout the transactions involved in the case Smith was the president and principal shareholder of Smith Aircraft, whose business was the buying and selling of aircraft. It was thinly capitalized and heavily financed. It had in late 1977 and early 1978 sold three other aircraft out of trust, a matter discovered by defendant Sandwich State Bank ("Bank") in May 1978 when it made a floor plan check on the five aircraft (including the three that proved to have been improperly sold) it was currently financing for Smith. For convenience, Smith and Smith Aircraft are sometimes collectively referred to in this memorandum opinion as "Smiths."

2. Maurice Shacket ("Shacket") was involved in all of the negotiations and closed the transaction on behalf of plaintiffs.

*Facts*

## 1. *The First Sale.*

Shacket, a private pilot and owner of aircraft for many years, contracted with Smith Aircraft in 1977 to buy a custom-built Piper Navajo plane for $126,000 plus the trade-in of a plane currently owned by Shacket, the wholesale value of which was $120,000. Shacket paid $20,000 down on the purchase price upon signing the contract with Smith Aircraft. Smith Aircraft in turn contracted to acquire the plane from Clark Aviation, Inc. ("Clark," the Piper franchisee for the area), an arrangement of which Shacket was aware. Before the closing of Shacket's purchase of the plane, Smith located a customer for his resale of the trade-in aircraft, and Shacket turned over possession of the trade-in aircraft for delivery to Smith's customer. After completion of the necessary work on the Piper Navajo to meet Shacket's specifications, the closing was set for April 18, 1978.

As of the closing date Smith Aircraft had not been able to pay Clark for the plane to be sold to Shacket,[3] but that did not prevent the closing from taking place on April 19. Closing involved a meeting at an airport attended by Shacket, Smith and Clark's president and principal shareholder, Kenneth Rittenhouse ("Rittenhouse"). Rittenhouse had previously told Shacket of financial problems Clark had encountered with Smith Aircraft (the delivery of one, or perhaps two, NSF checks). As a special request Rittenhouse had told Shacket that he wanted to be present at the closing and that Shacket should not pay Smith Aircraft for the plane unless Rittenhouse were there.

At the closing Shacket asked Rittenhouse whether it was all right to close the purchase of the plane and Rittenhouse said it was. Shacket then endorsed two cashiers' checks aggregating $106,000 in favor of Smith Aircraft. Rittenhouse and Smith showed Shacket the plane, turned over to Shacket various manuals and the certificate of airworthiness and handed the keys to Shacket. Shacket flew the plane to Detroit and has had possession ever since.

Essentially the problem in this case has been generated by Smith's failure at the closing to give Shacket all the proper bills of sale reflecting the chain of title to the plane. Smith did give Shacket the buyer's copy of the bill of sale from Smith Aircraft to Shacket, together with photocopies of the bills of sale covering prior transfers of the plane, and told Shacket that Smith would "take care of the paperwork." Shacket understood that to include an undertaking by Smith to record the bills of sale as part of the "paperwork."

There is a central registration system for aircraft conveyances under the Federal Aviation Act (the "Act"). Such registration requires the original bill or bills of sale covering the chain of title. After the closing Shacket made several attempts to get the prior bills of sale from Smith but was unsuccessful. Thus Shacket was unable to register his purchase with the Federal Aviation Administration (the "FAA").

## 2. *The Second Sale.*

Before the events described in the prior section, McArdle had been pressuring Smith to repay the remaining balance of $60,000 on Philko's $80,000 loan made to Smith Aircraft in December 1977. On April 18, 1978, the same day that Shacket arrived in Aurora for his closing the following day, Smith came to McArdle and represented that he had contracted with Clark to purchase a plane (which was in fact the same plane about to be paid for by and delivered to Shacket) for resale to a third party, Krueger Aviation. Smith claimed to have tried to borrow $152,000 from Bank on the plane but to have been refused because that would have exceeded his line of credit with Bank.

---

**3.** There is a dispute as to whether Smith paid any money at all to Clark. Shackets allege that $3,000 was paid, with all subsequent checks being returned for insufficient funds. Defend-ants claim that all of the checks from Smith to Clark were returned for insufficient funds. That dispute does not raise any issue as to a material fact.

After McArdle and Bank had examined the original prior bills of sale that Smith exhibited, McArdle agreed that Philko would take title to the plane from Smith Aircraft, enabling it to obtain the same $152,000 loan from Bank to be secured by that title, and then to complete Smith Aircraft's previously committed sale to Krueger Aviation. All the proceeds of the Krueger sale would be credited to Smith Aircraft (with $152,000 of those proceeds being contemporaneously repaid to Bank, $60,000 being applied in payment of the prior Philko loan to Smith Aircraft, and the balance belonging to Smith Aircraft).

On April 22, 1978, just two days after the Shacket transaction, Philko executed its note for $152,000 to Bank, which in turn issued its cashier's check for that amount to Clark. Bank showed the remitter on the cashier's check as "Roger Smith Aircraft Sales, Inc. (Philko Aviation, Inc.)." On April 24, 1978 Smith Aircraft executed a bill of sale to Philko (the same date appears on all of Bank's security documents other than the Philko note to Bank, which was dated April 22).

At that point Bank had all of the original bills of sale establishing the paper chain of title in its possession (a series of bills of sale running from Piper Aviation to North States Aviation [the Piper distributor for the area] to Clark to Smith Aviation to Philko). All those documents were then transmitted by Bank to the Federal Aviation Administration for recording. Bank delayed that transmittal for a period of time. Its reason for delay was that where another sale of an aircraft is expected to be made, the administrative delay in recording earlier bills of sale can cause problems in implementing the subsequent sale. In any case, the present situation is that Shacket has the physical possession of, while Philko has the FAA registered title to, the plane.[4]

3. *Prior Relationships Among the Defendants.*

McArdle, the owner of a large number of corporations through his holding company McArdle, Ltd., first met Smith in 1976 or 1977 when McArdle was contemplating the purchase of corporate aircraft. In about April 1977 Smith, who wanted to acquire a new base of operations, learned about the availability for sale of the corporation that was lessee of the Aurora Airport from the City of Aurora. Because he didn't have funds to make the deal himself but regarded it as a good buy, Smith approached McArdle as a possible financial backer. Smith proposed that McArdle purchase the operation and lease it to Smith Aircraft on terms that would make it a good investment.

McArdle investigated Smith Aircraft's financial viability (including having an audit performed). He found that Smith Aircraft did a large volume of business but lacked operating capital and needed added credit to carry on its purchases of planes. Having satisfied himself on that score, McArdle caused one of his own corporations to purchase the Airport lessee (which became Philko by corporate merger) and caused Philko contemporaneously to sublease the Airport to Smith Aircraft for a five year term.

Smith Aircraft became more than a sublessee of Philko as a result of the April 1977 transaction, although the document the parties executed was termed a "Lease Agreement." In its sublessee capacity, Smith Aircraft agreed to make all the rental payments to the City of Aurora, and to perform all other obligations imposed on Philko as lessee, under the leases from the City; that much of course represented a conventional lessor–lessee relationship. But the parties also contracted for Smith Aircraft to conduct several related businesses *in Philko's name*, to be carried out by Smith Aircraft's own personnel:

1. the purchase and sale of aviation fuel and lubrication oils;

2. the operation of the flight school at the airport;

---

4. From the facts stated by the parties, it is the Court's understanding that the Krueger Aviation transaction promised by Smith never proceeded, but that fact is not critical to decision of the pending motions.

3. rendering of maintenance services; and

4. sales of *new* Piper aircraft.

Smith Aircraft was "permitted to do business *in its own name* as a purchaser and seller of *used* aircraft." For a period of approximately 1½ years thereafter Philko purchased aircraft for its corporate use from Smith Aircraft (which purchased such aircraft for its own account and resold them to Philko), and Smith Aircraft also carried out the sale of Philko's aircraft inventory in the same manner (it was not paid a commission as though it were a broker). During the same period McArdle also entered into two major financing transactions to assist Smith Aircraft (in addition to the April 1978 transaction discussed above in "The Second Sale"):

1. the guaranty of $100,000 of Smith Aircraft's $500,000 line of credit with Commercial Credit Equipment Corporation entered into at the same time as the April 1977 lease and other arrangements; and

2. the loan of $80,000 in December 1977, secured by the personal guaranties of Smith and his wife and by their pledge of the stock of Smith Aircraft.

Indeed, one portion of the April 1977 "Lease Agreement" was (taken in the light *most favorable* to Philko) still another financing of—that is, an extension of credit to—Smith Aircraft's operations. This was the provision under which Smith Aircraft was (1) to "provide its personnel for the operation of [Philko's] sale of aviation fuel and lubrication oils, which operation shall be conducted only in the name of [Philko] as provided below," and (2) to remit to Philko, within ten days after the end of the month of *sale* of such materials, the cost of all such materials purchased in Philko's name plus the amounts due to the City of Aurora by reason of such sales.

In still another aspect of the Smith–McArdle relationships, McArdle proposed in December 1977 to purchase the stock of Smith Aircraft, and Philko made a payment of $5,000 as an advance toward such possible purchase. That transaction was not consummated and the $5,000 was repaid early in 1978, so that at the time of the April 1978 transactions Smith still owned the stock of Smith Aircraft subject to the pledge to Philko.

As for the Bank–Smiths relationship, Smith Aircraft had established a floor plan arrangement with Bank beginning in 1974. As already stated, Smith's capital investment in Smith Aircraft has always been small, and Smith Aircraft experienced intermittent cash shortages from 1972 through 1978. Smith Aircraft's out–of–trust sale of aircraft financed by Bank has also been referred to earlier. Bank itself was experienced in airplane financing transactions, having handled about 100 since 1974 and having carried on two floor plan arrangements since 1974 involving substantial numbers of aircraft.

We turn then to the parties' respective motions in light of the facts as just summarized.

### *Shackets' Status as Good Faith Purchasers*

■ Ordinarily the law applicable to the sale of goods is the UCC (the Illinois version, Ill.Rev.Stat. ch. 26, §§ 1–101 ff., is hereinafter cited to the UCC section numbers). Here however the threshold question is whether the registration provisions of the federal Act for aircraft conveyances preempt the UCC for purposes of determining title questions relating to aircraft. From its inception in 1938 the Act was intended to unify title registration for airplanes and eliminate the confusing array of state statutes (a purpose especially appropriate in light of the great mobility of the subject matter). In dealing with priorities between claimants under successive transactions involving the same aircraft, courts have reached differing results as to the precise effect of the Act. Professor Gilmore has said that its provisions "obviously amount to a good deal more than a recording sys-

tem . . . but are still a good deal less than a comprehensive coverage of security interests in aircraft. . . . " 1 Gilmore, *Security Interests in Personal Property* 546–48 (1st ed. 1965).

█ But as between the parties to a transaction themselves, there appears to be no question that state law governs to determine the validity of the transfer from Smith Aircraft to Shackets.[5] We therefore turn to the UCC.

In that respect the first question is whether the sale to Shackets was valid in view of the fact that Smith Aircraft had never paid for the airplane built by Clark. On the record as presented to the Court, the conveyancing instruments bringing title to the plane up to Clark were in existence and copies were exhibited to Shackets at the closing. In those circumstances the Smith Aircraft–Shackets transaction can be validated under the UCC either on a theory of voidable title or entrustment.

█ Although the general rule is that a transferor can give no better title than he has himself, UCC § 2–403 provides several exceptions. Under Section 2–403(1)(c) a purchaser acquires voidable title "When goods have been delivered under a transaction of purchase . . . even though . . (c) it was agreed that the transaction was to be a cash sale . . . " As stated in J. Fonseca and A. Squillante, *Williston on Sales* § 23–13 (4th ed.):

> The basic rule of the cash sale is that the transferor purchaser from the true owner has the ability to transfer a good title to a good faith purchaser for value even though that transferor purchaser never in fact paid for the goods.

Alternatively UCC § 2–403(2) states, "Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in the ordinary course of business." *Williston on Sales* § 23–14 summarizes the principles involved:

> Entrusting has four essential elements. First, there must be an actual entrustment of the goods by the delivery of possession of those goods to a merchant. Second, the party who receives the entrustment of those goods must be a merchant who deals in goods of that kind. Third, that merchant who deals in goods of that kind must make a sale of those goods. Fourth, the sale which the entrusted merchant makes must be to a buyer in the ordinary course of business.[6]

On the day of the closing, President Rittenhouse of Clark flew the Piper Navajo to the airport where the closing took place. It is undisputed that Shacket asked Rittenhouse at the closing whether it was all right to pay the money to Smith Aircraft and Rittenhouse responded affirmatively. Clearly Clark, through Rittenhouse, either entrusted the goods or gave voidable title to Smith Aircraft (which was equally clearly a merchant dealing in aircraft).

█ Doctrines of voidable title and entrustment do not protect all purchasers. To secure good title from a party who has only voidable title, one must be a good faith purchaser for value. Similarly, to secure good title from a party who has been entrusted with goods, one must be a buyer in the ordinary course of business. UCC § 1–201(9) defines a buyer in the ordinary course of business as one who buys "in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party . . . ." Thus to be protected by either

---

5. Section 1403(c) of the Act provides that no conveyance or instrument whose recording is provided for "shall be valid in respect of such aircraft . . . against any person *other than the person by whom the conveyance or other instrument is made or given* . . . " (emphasis added). It may be noted, though the issue is not the same, that Section 1406 provides that the validity of recordable instruments is to be governed by state law.

6. In the analogous area of automobile sales, it is well settled that a sale will be upheld even though the certificate of title has not been transferred. See for example *Humphrey Cadillac & Oldsmobile Co. v. Sinard,* 85 Ill.App.2d 64, 229 N.E.2d 365 (1st Dist. 1967); *Wood Chevrolet Co., Inc. v. Bank of the Southeast,* 352 So.2d 1350 (Ala.1977).

the voidable title or the entrustment doctrine, Shackets were required to have been purchasers in good faith.

■ Defendants first assert that Smith Aircraft was an agent of Shackets authorized to purchase an airplane from Clark. But an agency relationship is a consensual agreement whereby a principal authorizes an agent to bind him to a contractual relationship; in the context of this action if Smith Aircraft were acting as an agent and not as a principal for its own account, the purchase transaction with Clark, including the price of the aircraft as negotiated by Smith, would have had to be for the direct benefit of Shacket. To support their argument defendants offer only a copy of a December 2, 1977 letter from Smith Aircraft to Shacket enclosing, as "the specifications for your 1978 C/R Navajo," a copy of a two–page Clark–Smith Aircraft document captioned "Agreement To Purchase." However, mere knowledge on the part of Shacket that Smith Aircraft had to purchase the plane to be sold to Shackets does not create an inference of an agency relationship. There was no disclosure to Shacket of Smith Aircraft's purchase price from Clark, and the financial dealings between Shacket and Smith Aircraft were wholly buyer–seller in nature. Defendants have failed to offer any evidence that, even together with reasonable inferences, might raise a material factual question as to the existence of an agency relationship.

■ Defendants also allege a lack of good faith on the part of Shacket. UCC § 1–201(19) defines good faith as "honesty in fact in the conduct [of] transaction concerned." This language has been universally interpreted as mandating a subjective test based on what the party actually believed. *Walter E. Heller & Co. v. Convalescent Home*, 49 Ill.App.3d 213, 8 Ill.Dec. 823, 365 N.E.2d 1285 (5th Dist. 1977).[7]

Shackets assert that good faith has been proved by the following facts: Shacket paid $126,000 in cash to Smith and delivered his own former airplane as a trade–in (these factors of course also go to establish Shackets' status as purchasers); and at the closing Shacket specifically asked Rittenhouse whether it was all right to close the purchase and was told that it was (Rittenhouse said nothing about Shacket's not doing so because Smith Aircraft had not paid Clark for the plane). Defendants charge bad faith on the basis of the following facts: Shacket refused to deliver the bill of sale on the trade–in plane (defendants argue that this shows Shacket's doubts about Smith's ability to convey title); Shacket tried several times after the closing to get the bill of sale from Smith; Shacket had long been aware of the registration requirement and its importance; Shacket tried after the closing to get new bills of sale from Rittenhouse; and Shacket was aware before the closing that Smith Aircraft was having trouble paying for the plane.

All of defendants' arguments based on post–closing events (Shacket's efforts to get the bill of sale from Smith or new bills of sale from Rittenhouse, and Shacket's non–delivery of a bill of sale on the trade–in plane) do not raise a genuine issue of material fact as to Shacket's good faith at the closing. Whether or not a purchaser was in good faith at the time of purchase, his inability to get the title documents needed for recording would have elicited exactly the same efforts. And the same is true of the trade–in transaction.[8] As for Shacket's

---

**7.** Defendants' citation of *Hollywood National Bank v. International Business Machines Corp.*, 38 Cal.App.3d 607, 113 Cal.Rptr. 494 (2d Dist. 1974), construing the critically different California version of the UCC, is entirely inapropos.

**8.** Shacket actually surrendered possession of his trade–in plane for delivery to Smith Aircraft's customer *before* the closing. It was *after* the closing, when Shacket could not obtain the documents on the Smith Aircraft

plane, that he withheld the bill of sale on the trade–in aircraft. Defendants prove too much when they seek to draw inferences as to Shacket's good faith from the fact that the delivery of an aircraft, or the payment for a purchased aircraft, is not made contemporaneously with delivery of the conveyancing document covering the aircraft. As noted in the factual summary contained in this opinion, Philko itself turned over $152,000 to Smith Aircraft on April 22 but the bill of sale from Smith Aircraft was

awareness of Smith Aircraft's financial problems, Shacket had no obligation to monitor Smith Aircraft's financial arrangements with Clark (a matter between those two parties), and Shacket's failure to do so does not bear on the issue of his good faith. Instead, Rittenhouse's response to Shacket at the closing that it was all right to proceed—after Rittenhouse had specifically asked to be present—conclusively rejects any lack of good faith, which the parties agree is the material fact on this issue (citing *Tumber v. Automation Design & Mfg. Co.*, 130 N.J.Super. 5, 324 A.2d 602 (1974)).

Accordingly the Court finds that there is no genuine issue of any material fact regarding Shackets' good faith in purchasing the plane. Shackets are held to have been bona fide purchasers of the plane for value and in the ordinary course of business, and therefore to have secured good title to the plane from Smith Aircraft.

### Philko's Status as a "Purchaser"

■ Shacket's status as a good faith purchaser does not end the matter. Defendants' motion for summary judgment argues that Philko is the sole owner of the plane (subject to the lien in favor of the Bank) even if Shacket acted in good faith. They assert that Shacket's failure to record the transaction with the FAA rendered the sale void as to third parties. Shackets, on the other hand, interpret the Act as also requiring the use of state law in determining the priorities between the two "purchasers" from Smith Aircraft. Because title to goods generally passes on transfer of possession, Shackets argue that they acquired good title to the plane and Smith Aircraft therefore had nothing left to convey to Philko.

■ In the Court's view, it is not necessary to resolve this dispute over the legal effect of recording or non–recording under the Act as between *purchasers* from the same party. That issue need not be reached because, based on McArdle's own statements, Philko is not a "purchaser" at all.[9]

■ Both parties have glossed over (perhaps understandably in the case of defendants' counsel) the full statement of the key fact acknowledged by McArdle, that the *entire* economic benefit of the Krueger Aviation purchase (not just the $60,000 used to pay off Smith Aircraft's debt to Philko) was going to go to *Smith Aircraft* not Philko. McArdle clearly stated in his deposition that all the funds from the sale, after paying the $152,000 bank loan entered into to obtain the aircraft from Clark, would inure to Smith Aircraft: $60,000 to pay off the loan from Philko, and the very substantial balance (perhaps $68,000 to $78,000) to Smith Aircraft directly.

In his deposition, McArdle said that Smith had called him to ask for a meeting. At the meeting (emphasis added):

> [Smith said] that he *had sold* an airplane to Krueger Aviation ... for $280 or $290 [thousand dollars] ... [Smith] said that he wanted–he had gone to the bank and requested financing for the balance of the purchase of $152,000. And the bank told him that if they loaned him $150,000 it would be beyond his line of credit, words to that effect .... and he said that if I purchased this airplane, when this buyer, Krueger Aviation, was going to purchase–would purchase the thing

dated April 24 (as were the Bank's security documents other than the $152,000 note). Do defendants contend that this demonstrates Philko's lack of good faith as a purchaser—or that if Smith had unlawfully sold the plane a third time, Philko's inability to obtain the Smith Aircraft bill of sale on April 24 would have shown that it was in bad faith at the time it made payment on April 22?

9. Shackets make a related contention based on the fact that "buying" under UCC § 1–201(9) "does not include a transfer ... in total or

partial satisfaction of a money debt." But the Philko–Smith Aircraft transaction wasn't simply "in total or partial satisfaction of a money debt"—the $60,000 owed to Philko. That provision literally applies where no new consideration, no fresh money, is advanced by the buyer. If the Philko–Smith Aircraft transaction were in fact a purchase, the fact that in addition to the satisfaction of debt another $152,000 was paid in cash would give Philko the status of a "buyer."

from me, witnessed the fact that I had a contract here signed by Krueger, I would receive my $152,000 or whatever it was plus the $60,000 from the proceeds of the sale. And of course the difference—it would be profit to him and Krueger, I guess.

When in response to the last statement McArdle was asked "Profit to him and Krueger?" he responded:

Well, profit to him [Smith]. And Krueger was a dealer and he was selling it to somebody subsequent to that.... I said that the papers all appear to be in order, etc., that I would sign the note and borrow the money to complete this transaction and take title to the airplane.

McArdle testified that he then called the Bank:

I think that I verified that Roger Smith couldn't borrow the money because it would exceed his credit or something like that.... I think that I called from my office saying to Mr. Andrews [of the Bank] that Roger Smith was bringing out a series of documents and a note signed by me; you follow? For him to check over the documents and so forth to find out if he had all the items that he needed for to make this loan.

Thus it is plain from his own testimony McArdle had no interest in the sale price to be paid by Krueger Aviation, except to make sure it was adequate to pay the bank loan and the $60,000 balance owed to Philko. That is the conclusive hallmark of a *credit* transaction not a *purchase*.

Philko was taking title with the anticipated quick re-transfer to Krueger Aviation [10] only because Bank required a creditworthy borrower as a condition to making its loan. Philko was acting to accommodate Smith Aircraft (though its purpose of

course was the legitimate one of obtaining repayment of its existing debt), not to take the risks of profit and loss that are the essence of a true purchase.[11] This situation is no different from the frequent disputes stemming from a lender's taking absolute title to property, which the courts uniformly treat as an equitable mortgage as a matter of law. Philko's acquisition of title to the plane was by way of security. It cannot shift to Shackets the consequences of the noncompletion of the Krueger transaction that Philko had relied on in agreeing to accommodate Smith.

Under UCC § 1–201(9) "buying" specifically does not include a transfer as security. Thus Philko cannot be a buyer in the ordinary course of business or a good faith purchaser under the UCC; it can only be a secured party. This case then presents a conflict between a bona fide purchaser, who failed to record a transaction, and the holder of a subsequently recorded security interest. It appears that only one case under the Act has dealt specifically with this issue, and the case enforced the subsequent lien. *Marsden v. Southern Flight Service, Inc.*, 227 F.Supp. 411 (D.C.N.C.1961). Although there have not been any subsequent cases that have dealt with this precise issue, the weight of subsequent authority (particularly since Section 1406 was added to the Act in 1964) has undermined the reasoning of that opinion.

Nearly all of the courts agree that a bona fide purchaser takes title free of a *prior* recorded security interest. *Bitzer–Croft Motors, Inc. v. Pioneer Bank & Trust Co.*, 82 Ill.App.3d 1, 37 Ill.Dec. 247, 401 N.E.2d 1340 (5th Dist. 1980); *Sanders v. M.D. Aircraft Sales, Inc.*, 575 F.2d 1086 (3d Cir. 1978); *Haynes v. General Electric Corp.*, 432 F.Supp. 763 (W.D.Va.1977), *aff'd per curiam*, 582 F.2d 869 (4th Cir. 1978); *North-*

---

**10.** This anticipation is confirmed by Andrews' statement as to the reason he did not immediately send the chain of title documents to the FAA.

**11.** This Court does not accept Shackets' argument that the numerous relationships between McArdle and Philko on the one hand and Smith and Smith Aircraft on the other were such as to

negate Philko's good faith purchaser status as a matter of law. But the other transactions in which McArdle and Philko directly provided Smith and Smith Aircraft with, or assisted them in obtaining, credit are clearly relevant to support the uncontradicted evidence—from McArdle himself—that this transaction was another extension of credit.

*ern Illinois Corp. v. Bishop Distributing Co.,* 284 F.Supp. 121 (W.D.Mich.1968); *Texas National Bank of Houston v. Aufdeheide,* 235 F.Supp. 599 (E.D.Ark.1964); *contra, Dowell v. Beech Acceptance Corp.,* 3 Cal.3d 544, 91 Cal.Rptr. 1, 476 P.2d 401 (1970), *cert. denied,* 404 U.S. 823, 92 S.Ct. 45, 30 L.Ed.2d 50 (1971). These courts have reasoned that while the Act pre–empts all state aircraft registration systems, it does not override basic state law principles governing priorities among conflicting interests. If a bona fide purchaser takes title free of a *prior* recorded security interest, it would follow *a fortiori* that the holder of a *subsequently* recorded security interest can not challenge the title of a bona fide purchaser.[12]

Under the circumstances of this case, then, there is also no genuine issue of material fact on the issue of whether Philko was a good faith purchaser or otherwise entitled to priority as against Shackets. It was not, as a matter of law.

### Count II of the Complaint

Shacket alleges in Complaint Count II that Smith and McArdle were business partners; that Smith had some interest in Philko; that Philko and McArdle were aware that the Shackets owned the plane when Smith Aircraft executed the bill of sale to Philko; that Philko aided and abetted Smith and Smith Aircraft in attempting to defraud the Shackets; and that Philko and McArdle joined Smith and Smith Aircraft in the illegal and fraudulent conversion of the Shackets' property. Except for the issue of conversion, which is a matter of law and follows from the matters already discussed in this opinion, there is no evidence in support of the allegations in Count II.[13] Certainly there is no showing of fraud or a knowing interference with the Shackets' rights by Philko or McArdle.

Defendants' memorandum in support of the McArdle–Philko cross–motion for summary judgment regarding Count II was not responded to by Shackets. Accordingly the Court finds there is no genuine issue of any material fact regarding the subject matter of Count II.

### Conclusion

This Court finds that there is no genuine issue as to any material fact in this action, that plaintiffs are entitled to judgment as a matter of law with respect to Count I and that defendants Philko and McArdle are entitled to judgment as a matter of law with respect to Count II. Counsel are di- ·rected to submit a form of final judgment for entry by the Court on or before September 29, 1980.

---

**12.** On the issue of bona fides, it should be noted that McArdle, though intimately aware of Smith Aircraft's undercapitalization and major financial difficulties (indeed, it was due to the overdue $60,000 loan, on which McArdle had been pressing for payment, that Smith came to McArdle with the proposal regarding the plane), simply accepted without any effort at verification the story that Smith Aircraft had its equity already invested in the plane. It should be remembered that Smith Aircraft lacked possession of the plane at that time as well. Had McArdle made the single inquiry of Rittenhouse as to either the story regarding the equity investment or the plane's whereabouts, the Shackets' rights would have been disclosed immediately (unless Rittenhouse were to choose to conspire in Smith's fraudulent conduct). This Court's decision does not, however, rest on any adverse inferences from those facts (which could properly be taken if only defendants had moved for summary judgment).

**13.** At the Shacket–Smith Aircraft closing, Rittenhouse told Shacket that Smith had a partner named Philko. Sometime after both "sales," McArdle told Shacket there was money owed oṅ the plane. Neither of those facts creates an issue of fact supporting the allegations of Count II.