**In the Matter of FIESTA CORPORATION, Debtor.**

**FIRST AMERICAN NATIONAL BANK OF WAUSAU, Plaintiff,**

**v.**

**FIESTA CORPORATION, M & I Peoples Bank of Coloma, Security State Bank of Colby, Internal Revenue Service, Viking Tool & Manufacturing and Wausau Accounting Systems, Inc., Defendants.**

**Adv. No. 82–0022.**

United States Bankruptcy Court, W.D. Wisconsin.

Dec. 8, 1982.

Brady Williamson, LaFollette, Sinykin, Anderson & Munson, Madison, Wis., Daniel A. Zazove, Towbin & Zazove, Ltd., Chicago, Ill., for debtors.

Stephen Meyer, Van Metre, Hanson, Clarke, Schnitzler & Meyer, Madison, Wis., for Security State Bank of Colby.

## MEMORANDUM DECISION ON SUMMARY JUDGMENT

ROBERT D. MARTIN, Bankruptcy Judge.

This adversary proceeding is primarily between two banks each claiming a prior security interest in a computer owned by the debtor, Fiesta Corporation ("Fiesta"). Plaintiff, First American National Bank of Wausau, ("First American"), defendant, Fiesta and defendant, Security State Bank of Colby ("Security State") have each filed motions for summary judgment. Judgment may be entered upon the defendants' motions for the following reasons.

In 1979, Fiesta purchased a model 960 Qantel computer ("the 960") from Wausau Accounting Systems, Inc. ("Wausau"). The purchase was financed by Security State. On November 6, 1979 Security State filed a financing statement perfecting its purchase money security agreement in the 960.

In November of 1980, Wausau gave First American a security interest in a model 245 Qantel computer ("the 245"). This security interest was perfected by filing on November 6, 1980. Whether the 245 was held for sale or for in-house use is disputed. However, it appears that the computer was used by Wausau for demonstration, programing, and as a back-up system for computers which it had already sold.

In July of 1981, Wausau sold the 245 to Fiesta. First American did not release its security interest in the 245. The terms of the sale called for payment of $50,000 plus the trade in of the 960. Fiesta did not obtain a release of Security State's security interest in the 960.

Both First American and Security State now claim security interests in the 245. First American claims priority based on the security interest which Wausau granted and which was perfected on November 6, 1980. Security State contends that First American's security interest was cut off under Wis.Stat. § 409.307 because Fiesta bought from Wausau in the ordinary course of business. Additionally, Security State claims a prior interest in the 245 as proceeds of the 960 which was traded in by Fiesta.

Between 1978 and 1981, Wausau sold five new Qantel computers and three used Qantel computers including those purchased by Fiesta. The affidavit of Neal Mix, president of Wausau, states that Wausau has never carried an inventory of computers for sale and that the primary business of Wausau is computer repair and maintenance. From 1978 until at least April of 1981, Wausau held a distributorship for Qantel

computers. Sometime between April and July of 1981, Wausau sold its Qantel distributorship rights to Mr. William Way under an agreement which provided that Wausau could sell Qantel equipment previously owned and used by Wausau, but could not sell any new Qantel computers. This provision was included to allow Wausau to dispose of the 245. Wausau specifically retained the right to service Qantel computers. In addition to the Qantel line, Wausau also sold Texas Instruments computers to banks. Between 1980 and 1982 seven Texas Instruments computers were sold.

When Fiesta purchased its first computer, the 960, from Wausau in 1979 it received a warranty and a maintenance agreement. In purchasing the 245 Mr. Gary Crawford, computer operator for Fiesta, viewed the 245 in Wausau's offices. It is not clear whether Crawford believed the computer was used by another or was an in-house model, but he thought he was saving about $20,000 by purchasing this model 245 as opposed to a new one. He saw other computers in Wausau's offices which he understood were for sale. Fiesta made a $5,000 down payment on the 245, but apparently made no subsequent payments. There was no warranty on the 245 but Fiesta did enter into a service agreement with Wausau. Security State knew that Fiesta traded in the 960, but did not release its security interest. Wausau did not check records and did not know of the security interest in the 960. Neither did Wausau notify First American that it was disposing of the model 245.

In contending that Fiesta, as a purchaser from Wausau acquired the 245 free of First American's security interest, Security State and Fiesta rely on Wis.Stat. § 409.307(1), which provides:

A buyer in ordinary course of business (S. 401.201(9)) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

First American argues that Fiesta may not rely on this provision, that Fiesta did not qualify as a "buyer in the ordinary course of business." A buyer in the ordinary course of business is defined in Wis.Stat. § 401.201(9) as follows:

'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a 3rd party in the goods buys in ordinary course from a person in the business of selling goods of that kind . . . .

Thus, the applicability of section 409.307(1) to this case depends upon whether Wausau was "a person in the business of selling goods of that kind . . ." at the time Fiesta bought the 245. Predictably, the parties characterize the Wausau-Fiesta sale in quite different terms. First American emphasizes the unusual aspects of the sale while Fiesta argues that Wausau was in the business of selling new and used computers.

The purpose of section 409.307(1) is to protect an innocent purchaser who could not reasonably be expected to check for prior security interests every time a purchase is made from a regular dealer or retail store. U.C.C. section 9–307(1) necessarily involves a balancing of the competing interests of purchasers and lenders, in which certain purchasers will prevail. The reasoning underlying this outcome has been expressed by the Wisconsin Supreme Court as follows:

The philosophy of the Uniform Commercial Code is that it is more reasonable to expect a secured party to investigate its debtor's business than to impose such a duty on a good-faith consumer. The purpose of sec. 307(1) of Article 9 . . . is to protect consumers.

*Antigo Co-op Credit Union v. Miller,* 86 Wis.2d 90, 98, 271 N.W.2d 642 (1978) (citation omitted). The court further outlined the policy of U.C.C. section 9–307(1) by quoting from Skilton, *Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code,* 1974 Wis.L.Rev. 1, 3–4:

'Protecting a buyer who takes in an unauthorized sale but who is a buyer in ordinary course of business rests on principles of justice and utility. The collateral involved, the inventory, is of such kind that the debtor's ability to dispose of it in the usual course of business may be important so that he may continue his business as a going concern, and, let us hope, pay his indebtedness to the secured party....

Further, there may be simple public policy favoring the safeguarding of sales transactions over the safeguarding of secured transactions....'

86 Wis.2d at 98, 271 N.W.2d 642.

Whether Wausau was an authorized dealer of Qantel is not the crucial issue. In *Antigo Co-op* the Wisconsin court was faced with the same question that is presented in the instant case. Sparks had purchased a horse trailer from Hoffmeister with financing from Antigo Co-op Credit Union, and subsequently sold the trailer to Miller. The Supreme Court affirmed the trial court's application of section 409.307(1) to cut off the credit union's security interest stating:

The only contested factual issue was whether Peggy Sparks, at the time Miller bought the horse trailer, was 'in the business of selling goods of that kind.' In the trial court's memorandum decision, the court made the finding that, prior to Miller's purchase, Sparks showed the trailer at a horse show and advertised it for sale. The court also found that there was another new trailer on Peggy Sparks' farm on the date of the sale. It found that Sparks bought trailers from Hoffmeister with the intent of reselling them. It found that she carried trailer parts for resale and color charts, which were provided by Hoffmeister. When she conveyed the trailer to Miller, she did so by the means of a 'Sales and Production Order,' which had been furnished her by Hoffmeister. She signed the sales instrument on the line provided for the dealer's signature. In addition to having a new trailer on the premises on the date she sold the trailer to Miller, the court found that she had sold another trailer immedi-

ately before she purchased the trailer eventually sold to Miller.

These skeletal findings are supported and amplified by the testimony. Miller testified that another 'brand' new horse trailer was on Peggy Sparks' premises when he picked up the one he purchased. Peggy Sparks testified that she had bought and sold several horse trailers, only two of which were financed through Antigo Co-op Credit Union. She stated that she sold horse trailers for Walter Hoffmeister and recounted that her arrangement to sell for Hoffmeister commenced in 1973. The arrangement with Hoffmeister was that she could take one trailer at a time and, when she sold it, she would pick up another one from him. She also testified that she picked up a pack of sales forms, color charts, and parts lists to facilitate the sales she might make. She testified that she kept a small stock of spare parts for the trailers, and when her spare parts stock got low, she would buy more. Although she specifically stated she did not have a 'dealership' for the sale of trailers, this was because a dealership agreement with the manufacturer required a deposit of $4,000.

*Id.* at 94–95, 271 N.W.2d 642 (footnote omitted).

The court concluded that the trial court's finding that Sparks was in the business of selling horse trailers was not contrary to the great weight and clear preponderance of the evidence. In addition, the court stated "[w]hether she was a 'dealer' in the sense that she had a manufacturer's franchise to sell is irrelevant. She was in the business of selling trailers." *Id.* at 96, 271 N.W.2d 642.

Although *Antigo* does not provide a specific analytical approach or test, it suggests certain factors which may be relevant to a finding that one is "in the business of selling goods of that kind." Advertisement and demonstration of the product, intent to resell, the sales documentation, and prior sales of the product all supported such a finding in *Antigo*. Limited inventory and

lack of a dealership franchise were not, in themselves, fatal to the determination that Sparks was "in the business."

In the present case, Wausau had sold other computers, and had sold the debtor a model 960 Qantel prior to the model 245. Gary Crawford, at the time he looked at the model 245 saw other computers in the Wausau office. Whether the 245 was advertised for sale is uncertain. It appears that Crawford went to Wausau because of his prior dealings with them on sales and maintenance. The president of Wausau stated in a deposition that the printed form used for the sale of the used 245 was no different from any contract Wausau had used for other sales of Qantel computers. Thus, even though Wausau terminated its dealership with Qantel, it retained most of the attributes which in *Antigo* were the basis for finding Sparks to be in the business of selling.

■ First American has emphasized Fiesta's knowledge that the Qantel distributorship rights had been transferred to William Way. Whether this transfer had actually taken place, and whatever the nature of the transfer, *Antigo* makes clear that the existence of a formal distributorship is irrelevant to this determination. Additionally, the court in *Antigo* also determined that the buyer's understanding of the nature of seller's business is only relevant to the question of good faith, and has nothing to do with proof of ordinary course of business. *Antigo* at 99, 271 N.W.2d 642. *See also Sea Harvest, Inc. v. Rig & Crane Equipment Corp.*, 181 N.J.Super. 41, 436 A.2d 553, 32 U.C.C.Rep. 1005 (N.J.Super.Ct.Ch.Div. (1981). There is no reasonable basis upon which it can be contended that Wausau had not previously been and did not continue to be in the business of selling as well as servicing computers.

■ Having analyzed the present case in light of the only Wisconsin case discussing the pertinent aspects of Wis.Stat. § 409.307 it is unnecessary to consider the cases decided under that U.C.C. provision as enacted in other states. There can be no reasonable contention that the sale of the 245 was not the sort of sale reasonably expected by the public in the regular course of Wausau's ongoing business.

First American also argues that Fiesta was not a buyer in the ordinary course because it lacked "good faith." "Good faith" is defined in Wis.Stat. § 401.201(19) as: "honesty in fact in the conduct or transaction concerned." This may be compared with the higher standard of good faith required of a merchant in Wis.Stat. § 402.-103(1)(b): "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *See Mattek v. Malofsky*, 42 Wis.2d 16, 20, 165 N.W.2d 406 (1969). Although no Wisconsin court has applied the "good faith" definition in the context of Wis.Stat. § 409.307 other courts have considered U.C.C. section 1–201(19).

In *Shacket v. Roger Smith Aircraft Sales, Inc.*, 497 F.Supp. 1262 (N.D.Ill.1980), *aff'd* 681 F.2d 506 (7th Cir.1982). The court specifically considered the application of U.C.C. section 1–201(19). The court first noted that "[t]his language has been universally interpreted as mandating a subjective test based on what the party actually believed." 497 F.Supp. at 1268. There, the purchaser paid cash and gave his used plane as a trade in for a new customized airplane. When he was unable to acquire title documents to the new plane, purchaser refused to deliver the title documents to his old plane. The court rejected arguments that this indicated bad faith, noting that developments subsequent to the time of closing were not relevant to the buyer's good faith at the time of closing. The court granted summary judgment on this issue.

■ First American's allegations, that Fiesta bought after Wausau had sold its franchise, failed to pay for the computer, and failed to obtain a release of the security interest in its model 960, even if true, do not give rise to an inference of dishonesty. Although a buyer's understanding of the nature of seller's business is relevant in finding a lack of good faith, the court in *Antigo Co-op* noted that the existence of a distributorship is not relevant to this ques-

tion. 86 Wis.2d at 96, 271 N.W.2d 642. Additionally the failure to pay for the computer arose after the time of sale; there is no allegation that Fiesta entered into this transaction with the intention of not paying for the computer. Finally it should be noted that both Wausau and Fiesta were acting in disregard of the security interests in their computers.

A number of other factors which might lead the court to conclude that Fiesta acted in bad faith are not present in this case. *See* Annot. 87 A.L.R.3d 11. For example there is no allegation that this was anything less than an arm's length transaction, or that it was a sham sale or a bulk sale of any sort. There is also no allegation that Fiesta purchased the model 245 with knowledge that the sale was in violation of First American's security agreement. Although First American points to the savings in the price on the computer there is no allegation that the purchase was below the market price for a used computer.

Upon the foregoing the summary judgment may be entered dismissing the complaint of First American National Bank of Wausau.