In the Matter of POLAR CHIPS INTERNATIONAL, INC., Debtor.

Herb HARRIS, Plaintiff,

v.

Samuel J. FOOSANER, Defendant.

Bankruptcy No. 81–00823–BKC–JAG. Adv. No. 82–0484–A.

United States Bankruptcy Court, S.D. Florida.

Feb. 23, 1984.

Jeffrey Warren, Bush, Ross, Gardner, Warren & Rudy, Tampa, Fla., for plaintiff.

Aaron A. Foosaner, Smith & Mandler, P.A., Miami Beach, Fla., for defendant, Samuel Foosaner.

## PARTIAL OR PRELIMINARY FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This matter was tried on the Complaint of the Trustee against Defendant, SAMUEL FOOSANER, to compel turnover, requesting an accounting, seeking damages, and on the counterclaim of FOOSANER against the Trustee. Several other Defendants originally joined by the Trustee were dismissed prior to trial. (C.P. Nos. 41, 42, 43). The trial was held on two separate dates, and, upon the stipulation of counsel, the deposition of Laura Caprita was considered as evidence in the case, although the deposition was taken subsequent to the continued trial date.

After the trial of this adversary was completed the Trustee was discharged, and

the Reorganized Debtor succeeded to the Trustee's interest. For ease of understanding the ruling in relation to the pleadings, evidence, and transcript, these Findings and Conclusions will refer to the Trustee throughout.

The dispute here is over the ownership of ice vending machines which were placed in motels or public areas. The debtor, POLAR CHIPS INTERNATIONAL, which was operated at the time by its president and owner, Walter Kellin, was in the business of selling ice vending machines to investors who would lease the machines back to POLAR CHIPS. POLAR CHIPS would service the machines and, after making the lease payments, would retain the income from the machines. One of the causes of collapse of the Debtor was the apparent fraud of Walter Kellin, which included selling more ice machines than existed, and operating a ponzi scheme by making lease payments out of new investors' money rather than from income generated by the ice machines.

Turning to the circumstances of FOOSANER's case, Defendant became acquainted with POLAR CHIPS through Joanne Darrow. Ms. Darrow was herself an investor, having purchased a number of ice machines with her husband. She further arranged a business relationship with POLAR CHIPS where servicing of POLAR CHIPS' (owned or leased) ice machines was done by Controlled Ice, a company which she helped form and in which she had an interest through its partial ownership by Rockingham Enterprises, which she owned. Mario Cicotti was the other principal of Controlled Ice, and he not only handled the servicing of machines, but was also to receive a commission for obtaining new locations for the placement of POLAR CHIPS machines. Controlled Ice operated in the Orlando, Florida area and Kellin represented to Darrow and Cicotti that this area was to become the POLAR CHIP headquarters and that therefore the ice vending machine operations in the area would develop into a big business. All these grand plans arose and collapsed within the period of approximately January, 1981 to May, 1981.

In the meantime, FOOSANER learned of POLAR CHIPS, saw tax advantages to an investment, and decided to leap in. The documents are partially contradictory as to whom he contracted with, but the court concludes that he ultimately completed the purchase of fifty (50) ice machines from POLAR CHIPS, and leased them back to a related entity or individual. There are an additional fifteen (15) machines which FOOSANER is claiming, and which will be discussed subsequently.

## FIFTY FOOSANER MACHINES

As to the first fifty (50) machines there is no written contract for the purchase from POLAR CHIPS, but there is sufficient evidence to determine the substance of that agreement. FOOSANER was to purchase fifty (50) machines in contemplation of the leasing and servicing arrangement with POLAR CHIPS, but no specific machines were identified prior to the purchase. The evidence showed that POLAR CHIPS purchased component parts for the new machines from two (2) sources, and put them together to create the vending machines sold to investors. There were no serial numbers or other identifying marks on the machines as they came from the factory for delivery to the various locations. Because of the nature and use of the machines, purchasers would not take actual possession of the machines, but, instead, the machines would be delivered directly to the vending locations. Usually POLAR CHIPS procured the locations.

Although there was no contract for the purchase and sale, Defendant's receipts in payment for fifty (50) machines were put into evidence, (Plaintiff's Exhibit Nos. 6 and 13) and the Trustee does not dispute that FOOSANER paid for fifty (50) machines. There is greater, and, in fact, redundant, documentation of the leasing and servicing arrangement. On March 18, 1981, POLAR CHIPS, as Lessor and manager, entered into a Management and Lease Agreement with FOOSANER, as owner, in which Walter Kellin, individually,

also agreed to guarantee the arrangement and provide additional security to FOOSANER. (Plaintiff's Exhibit No. 9). On the same date an Identification and Lease Agreement (Plaintiff's Exhibit No. 10), concerning the same machines (as revealed by testimony) was entered into between Kellin individually as lessee, and FOOSANER, as lessor. Finally, there is an untitled document executed by Walter Kellin on the same date (Plaintiff's Exhibit No. 12 reciting that the fifty (50) ice machines purchased by FOOSANER "from Kellin Enterprises" will be leased by Walter Kellin.

The Trustee's primary argument in this case is that no sale to the Defendant was complete because all the machines are alike, and no particular machines were sold to FOOSANER. Two (2) sections of the Uniform Commercial Code have a bearing on the issue. Fla.Stats., § 672.401 provides, in pertinent part:

> ... Insofar as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply:
>
> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract ...
>
> (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods ...

As to identification of goods, Fla.Stats., § 672.501(1) provides:

> ... [I]dentification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs:
>
> ... (b) If the contracts are for the sale of future goods ... when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers ...

Usually "identification" of goods under the UCC will serve to protect a buyer prior to delivery of the goods. Here, however, since the buyers would obtain only constructive possession of the ice machines, delivery and identification are intertwined.

FOOSANER attempted to guarantee that certain machines were designated as his, even though he did not reside in the geographical area where the machines were placed and, as stated above, would not have taken physical possession of the machines in any case. The evidence showed that he considered Joanne Darrow his agent and that she obtained serial numbers from Walter Kellin for FOOSANER's machines, and in some, if not all instances, the number plates were supplied by Kellin. Mario Cicotti, who was servicing the machines, then attached the serial numbers to the machines and informed Darrow of the location of each machine according to the number it now showed. The serial numbers were listed on a document entitled Exhibit A (introduced into evidence as Plaintiff's Exhibit No. 16), which the evidence showed was intended to be an attachment to the Identification Lease Agreement. This was executed by both Walter Kellin, as Lessee, and by FOOSANER. There was additionally a "Supplemental Exhibit A (Plaintiff's Exhibit No. 17), showing the motel locations of each of the serial numbers from Exhibit A. This was not executed by FOOSANER, but was signed by Walter Kellin, as Lessee, and by Joanne Darrow. Cicotti's deposition testimony showed that he had verified the locations and provided the information to Darrow. FOOSANER's fifty (50) machines were purchased and shipped at two (2) different times, and the payments were receipted on March 11 and March 18, 1981. The location identification list was sent by Joanne Darrow to POLAR CHIPS for Kellin's signature on March 27, 1981 (Plaintiff's Exhibit No. 15).

The trustee argues that this after-the-fact attachment of number plates by Cicotti could not serve to prove that these were the machines purchased by FOOSANER, and that even if the numbers and locations match, the exhibits showing they were executed in conjunction with the lease agreement (to which POLAR CHIPS was not a party, whoever the lessee was intended to

be) and not in connection with the contract for sale.

A determination of the facts here is made more difficult, not only because of the contradictions in the documents, but because of the interrelationships of the parties. Joanne Darrow introduced FOOSANER to Kellin and POLAR CHIPS, and was used by FOOSANER as his agent, but also had a business relationship with POLAR CHIPS as to the same transactions. Likewise, Cicotti was Darrow's agent on behalf of FOOSANER, but he was involved in other business relationships with Darrow and POLAR CHIPS, also involving the same transactions. Kellin was the moving force behind POLAR CHIPS and Walter Kellin Enterprises, and seemed to use those entities interchangeably as to some business matters, as well as entering into transactions in his individual capacity. As a result, it appeared to investors to be the same entity selling the machines, leasing them back, and servicing them.

■ Given all of these facts, the Court concludes that, at the time the machines were identified by number and location, they were sufficiently identified and delivered for title to pass to the buyer, FOOSANER. When Cicotti attached the identification plates, he was acting as the joint agent of FOOSANER and Kellin, and under the circumstances of this case it must be concluded that Kellin was authorizing their identification on behalf of the seller, POLAR CHIPS, as well as on behalf of the lessee, especially since the numbers originated with Kellin and the identification of machines sold was in his control.

The Trustee's next position is essentially that, even if there was a prima facie satisfaction of the elements required for the completion of a sale, title to the machines did not and could not pass to FOOSANER because POLAR CHIPS did not have title to sell, having sold the same machines many times previously. This is a much more difficult question, and the Court concludes that if there were clear evidence that the same goods had previously been sold, the Defendant would not be able to obtain good title to them from the purported seller. Cf., *Shacket v. Roger Smith Aircraft Sales, Inc.*, 497 F.Supp. 1262 (N.D.Ill., 1980), in which the same aircraft was sold twice. However, the Court finds that the Trustee's proof on this point is insufficient, and therefore we need not reach the question of whether the Trustee (rather than a competing prior purchaser) would be entitled to the property now.

There was a suggestion that POLAR CHIPS' personnel used the same serial numbers over and over, when asked by investors to specify machines, but the testimony of Trustee's witnesses in this case does not clearly reveal that fact. (Because of the multitude of hearings and adversary proceedings in this bankruptcy proceeding, the Court is occasionally hard put to distinguish information gleaned in other hearings.) At any rate, there was no evidence that the actual serial numbers given to FOOSANER were also given to any other person.

Mr. Downey, manager of POLAR CHIPS after the bankruptcy, testified that he had concluded from company records that other buyers had been sold machines at the same locations as FOOSANER, and that the sales were necessarily duplicative, because there were not as many machines as there had been sales. This testimony alone is insufficient, however, to defeat FOOSANER's title to the machines. Since Mr. Downey was not present when the events occurred, his conclusions drawn from company records are of less probative value than the original records would have been. More serious, the testimony referred to no dates for the competing sales, so it can not be concluded that those were prior in time to the sales to FOOSANER. Finally, the evidence from other witnesses, in particular, Cicotti, showed that Kellin had Controlled Ice remove old "POLAR CHIPS" machines from many of the locations and put in new ones which were subsequently identified as belonging to FOOSANER. Therefore, where location was the only identifying factor, as in Downey's testimony, it is quite conceivable that other buyers

had purchased machines which were previously at the same locations as FOOSANER's machines, but were not the same machines.

A further argument of the Trustee, although not as vigorously pursued, is that the Court must conclude, given the identity of the various parties and the interrelated business transactions, that there was no true sale and lease back, but that instead FOOSANER obtained only a security interest in the machines, or perhaps an investment in POLAR CHIPS. Although certain aspects of the transaction raise that possibility, the documents and actions of the parties as a whole leave no doubt that a true sale was consummated. FOOSANER declined to execute financing statements which Kellin forwarded to him, and there is no provision in the lease that the machines be repurchased by POLAR CHIPS after the term of the lease. Walter Kellin may very well have preferred that "investors" not become true owners of particular machines, but he acquiesced to the sale of specific machines to FOOSANER. FOOSANER may have preferred the convenience of ownership of a mere investment in a business, but he required ownership of the machines themselves for his tax purposes, and he intentionally entered into an arrangement which gave him true ownership, while minimizing the operational involvement required of him.

Finally, the Trustee argues that if title was transferred to FOOSANER upon identification of the machines, as discussed above, it was a preferential transfer under 11 U.S.C. § 547 for or on account of an antecedent debt. There is no merit to this contention because the transaction cannot be construed to have consisted of the creation of an "antecedent" debt, and a later transfer of the equipment. Instead, it would come within § 547(c)(1)(A) as a transfer that was "intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor...." Under the circumstances of the transaction and the method of identification agreed to by both parties, the period between the payment of the consideration by FOOSANER and the identification of the machines sold was a very short period of time, and certainly qualifies as a "contemporaneous exchange".

For these reasons the Court concludes that FOOSANER received title to the fifty (50) machines identified on Plaintiff's Exhibit Nos. 16 and 17.

### FIFTEEN DARROW MACHINES

Slightly different circumstances were involved with the additional fifteen (15) machines which are in dispute between FOOSANER and the Trustee.

FOOSANER testified that when he first dealt with Walter Kellin, he felt that Kellin downgraded Darrow in their business relationships. FOOSANER conceived of the idea of having additional machines purchased in the Darrows' names, to make it appear to Kellin that the Darrows were persons of more substantial means. FOOSANER wished to do this to obtain better treatment for Joanne Darrow both as a friend and because she represented his interests. This was done, and the Darrows purchased an additional fifteen (15) machines from POLAR CHIPS, with the same leaseback arrangement as FOOSANER had (Plaintiff's Exhibits Nos. 29 and 33). However, FOOSANER provided the funds for the purchase, and there was an agreement between FOOSANER and the Darrows that they were acting merely as Trustees for him (Plaintiff's Exhibit No. 20). There is no dispute between the Darrows and FOOSANER, so although POLAR CHIPS believed the Darrows to be the purchasers, the Darrows' rights can be asserted by FOOSANER.

Unfortunately for FOOSANER, the evidence as to these machines is insufficient to substantiate identification, either as to an acknowledgment by POLAR CHIPS of the identity, or as to which were the Darrows' machines personally, and which were being held for FOOSANER. (The agreement between FOOSANER and the Darrows does not identify any machines.)

There are several invoices from POLAR CHIPS to the Darrows, some with conflicting dates, and some earlier than the dates at which FOOSANER agreed to provide the money for the purchase of machines (Plaintiff's Exhibits Nos. 22–25). There are also two (2) memoranda listing serial numbers and locations (Plaintiff's Exhibits Nos. 32 and 33). The most serious problem with these, however, is that there is no execution or acknowledgment by POLAR CHIPS. In addition, the serial numbers by location do not correspond to the serial numbers or invoices, or to the memorandum which lists serial numbers assigned to the "Controlled Ice" machines (Plaintiff's Exhibit No. 33). Therefore the Court concludes that FOOSANER has not established his ownership of the machines listed on Exhibit No. 32. The Trustee's Complaint for an accounting will be granted as to these machines. (Subsequent to the fall of Kellin's empire, but before the Trustee obtained actual possession of the ice machines, FOOSANER received the vend from all sixty-five (65) machines which he claimed.)

It was agreed at trial that the issue of damages would be tried at a subsequent date if it became necessary as a result of this Court's ruling on the ownership of the ice machines and as a result of the accounting. A final hearing on damages to be awarded the Debtor-in Possession as to these fifteen (15) machines will be set at the request of the parties.

## COUNTERCLAIM

■ FOOSANER has counterclaimed for actual and punitive damages arising from the giving of two (2) bad checks by POLAR CHIPS, which caused him acute embarassment, and from alleged harassment by the Trustee in the Trustee's insistence that FOOSANER did not have good title to the ice machines which he was claiming (C.P. No. 24). An *ore tenus* motion by Defendant to increase the amount of damages claimed was granted. A further pleading denominated "Amended Counterclaim" (C.P. No. 50) was not properly filed, and was not considered by the Court as an amendment, although FOOSANER conceded that it primarily embodied the *ore tenus* amendment which had been permitted previously. Among the actual damages claimed by FOOSANER was loss of profits, apparently for the loss of revenue from the ice machines after they were removed from their locations. Counterclaimant has entirely failed to carry his burden of proof on any issue in the counterclaim. The evidence as to loss of profits was purely speculative, and was not supported by other evidence at all as to bad faith which would form the basis for an award of punitive damages. Therefore, Defendant's Counterclaim will be denied.