FIRST BANK OF NORTH DAKOTA (N.A.)—JAMESTOWN, a national banking association, Appellant,

v.

The PILLSBURY COMPANY, a Delaware corporation, Appellee.

No. 85-5434.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1986.

Decided Sept. 24, 1986.

---

David A. Ranheim of Minneapolis, Minn., for appellant.

Richard D. Anderson of St. Paul, Minn., for appellee.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and STROM,* District Judge.

LAY, Chief Judge.

First Bank of North Dakota (N.A.)–Jamestown (the Bank) brought this action against the Pillsbury Company (Pillsbury) for conversion of grain in which the Bank claimed a security interest. The district court[1] granted summary judgment in favor of the Pillsbury Company and dismissed the Bank's claim. The Bank now appeals. We affirm.

## I. Background

The Bank loaned large sums of money (in excess of $3,000,000) to Freddie and Marlys Mutschler, who were prominent farmers in Jamestown, North Dakota. The Mutschlers gave the Bank a lien on their crops, as partial security for the loans. The loan agreement provided that when the Mutschlers sold the grain they were obligated to turn over the proceeds to cover their indebtedness.

Freddie Mutschler was also the owner, but not the manager, of the Jamestown Farmers Elevator, which bought and sold various farmers' grain. The Mutschlers themselves sold grain to the elevator. In early 1982, Robert Solien, the Bank's officer who monitored the Mutschlers' loans at that time, discussed with Freddie Mutschler his 1982 crop and Mutschler's plans for its disposition. Solien and Mutschler verbally agreed that the crops would be marketed through the federal government's Commodity Credit Corporation (CCC) loan programs. The CCC would loan the Mutschlers money, with the harvested grain as security. The government was notified of the security agreement and instructed to make all checks for loans to the Mutschlers jointly payable to the Mutschlers and the Bank. Mutschler agreed that these checks would go directly to the Bank to reduce the Mutschlers' debt.

Sometime in the fall of 1982, the Mutschlers sold their crop to the Jamestown Farmers Elevator, but did not apply the proceeds to their debt at the Bank. The elevator in turn sold some of the grain, which had been commingled with that grown by other farmers, to the Pillsbury Company. The Bank did not discover these

---

* The HONORABLE LYLE E. STROM, United States District Judge for the District of Nebraska, sitting by designation.

1. The Honorable Paul Benson, Chief Judge of the United States District Court for the District of North Dakota, presiding.

events until the Mutschlers and Jamestown Farmers Elevator filed bankruptcy in early 1983. The Bank then sued Pillsbury for conversion of its collateral. The district court ruled that Pillsbury was entitled to the grain purchased, free and clear from any lien interest of the Bank.

## II. Discussion

The fundamental issue on appeal is whether section 9–307(1) of the Uniform Commercial Code (N.D. Cent. Code § 41–09–28(1) (1983)) protects Pillsbury against the Bank's conversion claim. That section provides:

A *buyer in ordinary course of business* (subsection 9 of section 41–01–11) *other than a person buying farm products from a person engaged in farming operations* takes free of a security interest *created by his seller* even though the security interest is perfected and even though the buyer knows of its existence.

N.D. Cent. Code § 41–09–28(1) (1983) (emphasis added).

### A. The Farm Products Exception

■ The Bank claims that the above provision does not protect Pillsbury, because Pillsbury bought "farm products from a person engaged in farming operations." The trial court found that Pillsbury did not purchase farm products. We agree. In the similar case of *United States v. Hext*, 444 F.2d 804 (5th Cir.1971), the FHA loaned money to Hext, who in turn granted a chattel mortgage on his cotton crop to the FHA. Hext also owned a cotton gin and sold his cotton to the gin, which in turn sold the cotton to others. The court held that once the goods were sold to the cotton gin they became inventory of an entity not engaged in farming operations and thus lost their characteristic as farm products.[2] *See id.* at 813–14 & n. 30; *cf. United States v. Progressive Farmers Marketing Agency*, 788 F.2d 1327, 1329–30 (8th Cir.1986) (interpreting identical Iowa U.C.C. provisions in context of hogs, which this court found became "inventory" in hands of marketing agent for debtors). Following *Hext* and our recent decision in *Progressive Farmers*, we think the farm products grown here were converted to inventory when they were sold to the elevator and intermingled with other grain. Inventory is defined by the U.C.C. as goods held for sale or lease. *See* U.C.C. § 9–109(4) (N.D. Cent. Code § 41–09–09(4) (1983)). We think it is clear that the Bank knew it was financing goods that could become inventory subject to purchase by innocent buyers in the ordinary course of business. *See* 2 G. Gilmore, *Security Interests in Personal Property* § 26.8, at 699–700 (1965).

As stated in an official comment to U.C.C. § 9–109:

Goods are "farm products" only if they are in the possession of a debtor engaged in farming operations.

\* \* \* \* \* \*

*When crops or livestock or their products come into the possession of a person not engaged in farming operations they cease to be "farm products." If they come into the possession of a marketing agency for sale or distribution or of a manufacturer or processor as raw materials, they become inventory.*

---

2. The Fifth Circuit observed:

Nor is there any doubt that ordinarily ginned cotton is in the category of "farm products" referred to by Section 9–307(1).

\* \* \* \* \* \*

We think this situation is directly analogous to one where a secured party takes a security interest in goods purchased by the debtor as consumer goods or equipment, knowing the debtor to be in the business of selling goods of that kind, and the debtor then puts the goods in his inventory and sells them to a buyer in ordinary course. Professor Gilmore has suggested that in such a situation the buyer should take free of the security interest under the provisions of Section 9–307(1). We agree. In the instant case, the FHA took a security interest in goods (the 578 bales of cotton) as farm products, knowing that the debtor had the capability of transferring them into the category of inventory and selling them in the ordinary course of his gin business. The buyers of the cotton thus took free of the security interest and could not themselves be sued by the Government for conversion.

*Hext*, 444 F.2d at 813–14 (footnotes omitted).

U.C.C. § 9–109 comment 4 (emphasis added). We conclude that under these standards the farm products exception does not apply to Pillsbury's purchases in this case.

## B. Protection of Good Faith Purchasers in Ordinary Course of Business

Even when the farm products exception does not apply, a purchaser still must show that it fits within the underlying protection of U.C.C. § 9–307(1). To begin the remaining analysis, we note that Pillsbury bought the grain in the ordinary course of its business activities. Judge Benson so found and this is not disputed. The Bank does raise the question of whether Pillsbury purchased the grain in "good faith," as required by N.D. Cent. Code 41–01–11(9) (1983).[3] Section 9–307(1) of the U.C.C. explicity protects a good faith purchaser "even though the buyer knows of [the security interest's] existence." *See* N.D. Cent. Code 41–09–28(1) (1983).

 The evidence, taken most favorably to the Bank's position, indicates that Pillsbury knew that the Bank had a security interest in the Mutschlers' crops and that Pillsbury assumed the Mutschlers were a major supplier of grain to the Jamestown Farmers Elevator. As the district court found, however, these facts do not support an inference that Pillsbury *knew* its purchase *violated the Bank's security agreement. Cf. In re Fritz-Mair Manufacturing Co.*, 16 Bankr. 417, 420 & n. 4 (Bankr. N.D.Tex.1982) (protecting buyer under identical Texas law because a "buyer in the ordinary course can know a security interest exists in the property if he does not know a sale to him violates the security interest"). Section 1–103 incorporates general equitable principles into the U.C.C. *See* N.D. Cent. Code § 41–01–03 (1983). One such principle is to place responsibility for a loss on the party best able to prevent the harm. *See Antigo Co-op Credit Union v. Miller*, 86 Wis.2d 90, 271 N.W.2d 642, 646 (1978) (quoting Skilton, *Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code*, 1974 Wis.L.Rev. 1, 3–4); 1 *Anderson on the Uniform Commercial Code* § 1–103:32, at 87–88 (3d ed. 1981). In this case, the Bank was in the best position to notify third parties of its security interest in farmers' crops, including the Mutschlers' 1982 crop. *Cf. First National Bank & Trust Co. v. Iowa Beef Processors, Inc.*, 626 F.2d 764, 768–69 (10th Cir.1980); *Anon, Inc. v. Farmers Production Credit Association*, 446 N.E.2d 656, 660 (Ind.App. 1983) (dicta). Pillsbury, on the other hand, would have had great difficulty if forced to find out what farmers actually grew the grain it purchased from various area elevators. In essence, both the Bank and Pillsbury are innocent parties, and the Mutschlers are the wrongdoers. In this situation the Bank must bear the loss because it was in the best position to control the Mutschlers' actions.

The Bank urges that Judge Benson, in following *Hext*, inconsistently found that Pillsbury's "seller" was the one who created the security interest but that the elevator, which sold the grain to Pillsbury, was not "a person engaged in farming operations."[4] Suffice it to say that we find the grain lost its characteristic as a farm product when the Mutschlers delivered it to the elevator and commingled it with other inventory. This is why the farm products exception is inapplicable—not because the Mutschlers and the elevator were considered as separate entities.

There can be little doubt that the lien was "created by his seller" under U.C.C.

---

**3.** A buyer in the ordinary course of business is defined under North Dakota law as

a person who *in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods* buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. * * *

N.D.Cent.Code § 41–01–11(9) (1983) (emphasis added).

**4.** The Bank argues that these findings treat the Mutschlers and the elevator as one entity for the purpose of "created by his seller" and two entities for the farm products exception.

§ 9–307(1), since the Mutschlers, who created the security interest, were the owners of both the farming operation and the elevator. Article 9 is intended to protect innocent buyers. *See First National Bank & Trust Co. v. Iowa Beef Processors, Inc.,* 626 F.2d at 769; *Antigo Co-op Credit Union v. Miller,* 271 N.W.2d at 646. Given this important desire, as stated in 9 *Anderson on the Uniform Commercial Code* § 9–307:8, at 194–95 (3d ed. 1981): "[T]he relationship between the former owner [of the collateral] and the seller may be such that the security interest created by the former owner may be regarded as having been created by the seller, in which case UCC § 9–307 is applicable." *See also Hext,* 444 F.2d at 814.

In our case it is clear that the elevator was the marketing agency for the Mutschlers. Because the Mutschlers were the owners of the elevator, and this fact was well known by the bank, we find that the lien was in fact and in law created by Pillsbury's seller.

Judgment affirmed. Costs taxed to the appellant.