FIN AG, INC., Respondent,

v.

HUFNAGLE, INC., f/k/a
P & H Trucking, et
al., Defendants,

Kent Meschke Poultry Farms,
Inc., Appellant.

No. A04–2176.

Supreme Court of Minnesota.

Aug. 10, 2006.

John Brakke, Vogel Law Firm, Fargo, ND, for Respondent.

Britton David Weimer, Blackwell Igbanugo, P.A., John G. Berg, Minneapolis, MN, for Appellant.

Paul A. Banker, Esq., Lindquist & Vennum P.L.L.P., Minneapolis, MN, for Amicus Curiae.

OPINION

HANSON, Justice.

This case concerns the impact of grain "fronting" on the respective rights of buyers of farm products and those who hold a security interest in those products. The security interest holder, respondent Fin Ag, Inc., brought suit against the buyer, appellant Kent Meschke Poultry Farms, Inc. (Meschke), for conversion of corn grown by the debtors, Larry and Ronda Buck, doing business as Buck Farms (Buck). The corn had been sold to Meschke in the names of third persons not involved with the debt to Fin Ag. The district court granted summary judgment to Fin Ag, holding that, under 7 U.S.C. § 1631 (2000)—enacted as part of the federal Food Security Act of 1985(FSA)—the registration of Fin Ag's security interest in Buck's name put Meschke on notice of the interest and that the appearance of third persons as the sellers did not protect Meschke from the security interest created by Buck. The court of appeals affirmed, holding that Buck had constructive possession of the corn and Meschke had constructive knowledge of the security interest against Buck's corn. Meschke

sought further review, arguing that section 1631 requires actual, not constructive, possession or knowledge and that a buyer from a disclosed seller takes title free of a security interest that is in the name of an undisclosed owner. We affirm.

### A. *The Statutory Framework.*

To develop a proper framework for the analysis of this case, we must consider the interaction between the state and federal statutes that address the conflict between the rights of buyers of farm products and the rights of those who hold a security interest in those farm products. Because the Minnesota statutes governing security interests in farm products have been revised from time to time, it is helpful to first consider what that interaction was when Congress first enacted 7 U.S.C. § 1631 in response to perceived shortcomings in the Uniform Commercial Code (UCC).

Prior to 1985, the UCC generally reflected a policy that favored the rights of the holders of security interests, presumably to promote the availability of credit on reasonable terms. Thus, UCC section 9–201 recognized that "a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." U.C.C. § 9–201 (1972) (amended 2000), 3A

U.L.A. 651–52 (2000). And the general rule embodied in UCC section 9–306 was that a security interest in goods continues despite the sale of those goods by the debtor. U.C.C. § 9–306 (1972) (amended 2000), 3B U.L.A. 33–34 (2002). That general rule was subject to an exception under UCC section 9–307, where a "buyer in the ordinary course of business"[1] could take the goods free of some security interests, but only those that were "created by his seller." U.C.C. § 9–307 (1972) (amended 2000), 3B U.L.A. 154 (2002). But that exception did not apply to buyers of "farm products." *Id.* Thus, the UCC protected buyers in the ordinary course of business only from security interests created by the buyer's seller; and buyers of farm products were excluded from even this narrow protection.[2]

The practical effect of the exclusion of farm products from UCC section 9–307 was that buyers of farm products became guarantors of their seller's debt. As a result, more than a third of the states amended UCC section 9–307 in various ways, generally attempting to reduce the bias in favor of lenders by providing mechanisms that would assist buyers in protecting their interests. Charles W. Wolfe, *Section 1324 of the Food Security Act of 1985: Congress Preempts the "Farm Products Exception" of Section 9–307(1) of the Uniform Commercial Code*, 55 UMKC

---

**1.** A "buyer in the ordinary course of business" was defined as "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind." U.C.C. § 1–201(9) (1972) (amended 2000), 1 U.L.A. 155 (2002).

**2.** Although the Commissioners on Uniform State Laws modified Article 9 in 2000, the only relevant change to section 9–307(1) was to renumber it as section 9–320(a). *Compare* U.C.C. § 9–307(1) (1972), 3B U.L.A. 154

(2002), *with* U.C.C. § 9–320(a) (2000), 3 U.L.A. 218 (2002). Prior to the passage of the FSA, Minnesota followed the recommended uniform provisions by adopting the general rule that security interests continue in the goods after they are sold, providing an exception for buyers in the ordinary course, and excluding buyers of farm products from that exception. *See* Minn.Stat. §§ 336.9–306, 336.9–307 (1984). In 2001, Minnesota renumbered the buyer in the ordinary course of business exception to be Minn.Stat. § 336.9–320(a) (2004), following the 2000 changes to the UCC.

L.Rev. 454, 461–64 (1987).[3] The various state amendments were not consistent with one another and diluted the uniformity goals of the UCC. Wolfe, *supra,* at 455, 461–64.

Congress became concerned with the impact of the UCC on buyers of farm products and with the inconsistent amendments to UCC section 9–307 by many states. Wolfe, *supra,* at 463. Often, buyers of farm products did not know of a security interest or have any practical way to discover it and thus were required to pay twice for the product—once to the seller and a second time to the security holder if the seller defaulted on the debt. *See* 7 U.S.C. § 1631(a). To address this situation, Congress in 1985 enacted 7 U.S.C. § 1631 (titled "Protection for purchasers of farm products"). Where it applies, section 1631 preempts all conflicting state laws. *See* 7 U.S.C. § 1631(d) (prefacing the statutory rule by stating "notwithstanding any other provision of Federal, State, or local law").

The title and congressional findings of section 1631 suggest that it was intended to protect buyers of farm products from having to make "double payment for the products, once at the time of purchase, and again when the seller fails to repay the lender." 7 U.S.C. § 1631(a)(2). But the protection actually provided by section 1631 was not as sweeping as the statement of intent might suggest. As explained below, section 1631 did not provide that the buyer would take free of all security interests, but instead only established a notice system that provided a mechanism for buyers to protect themselves from some, but not all, security interests.

Section 1631 established, contrary to the UCC, that a buyer of farm products in the ordinary course of business takes free of security interests created by the seller. Section 1631(d) provides:

> Except as provided in subsection (e) of this section and notwithstanding any other provision of Federal, State, or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations *shall take free of a security interest created by the seller,* even though the security interest is perfected; and the buyer knows of the existence of such interest.

7 U.S.C. § 1631(d) (emphasis added). Notably, section 1631(d) adopted the same narrow scope of protection as provided in section 9–307 of the UCC—it only provides protection against a security interest "created by the seller." Therefore, this language provides no protection for a buyer of farm products from any valid security interest that was created by someone other than the immediate seller.

The federal statute does provide exceptions to section 1631(d). 7 U.S.C. § 1631(e). Under these exceptions a buyer of farm products takes subject to a security interest created by the seller when notice has been given by one of three specified notice procedures. *Id.* Two of the notice procedures apply where states have established central filing systems to provide notice to registered farm product buyers. *Id.*

Minnesota created such a central filing system in 1992. *See generally* Act of April 27, 1992, ch. 525, 1992 Minn. Laws 1322, 1322–34 (codified as amended at Minn. Stat. ch. 336A (2004)). Under Minnesota's system, a lender is authorized to register the security interest with the Secretary of State by filing an "effective financing statement." Minn.Stat. § 336A.04, subd. 1

**3.** As noted below, Minnesota was counted as one of those states for changes it made to the UCC in 1986. *Wolfe, supra,* at 461 n. 51, 462 n. 63.

(2004). The Secretary of State compiles a list of debtors whose farm products are subject to security interests and makes this list available to registered farm products dealers and to others on request. Minn.Stat. § 336A.08 (2004). Before purchasing farm products, a buyer is expected to check the list. *Cf.* 7 U.S.C. § 1631(e)(2, 3).

At the time of the transactions at issue here, Minnesota's version of UCC section 9–307 had been modified from the uniform provision. Between 1986 and 2001, Minnesota's version of that section eliminated the exclusion for buyers of farm products from the buyer in the ordinary course exception, meaning that a buyer of farm products could take free of a security interest "created by his seller" if he qualified as a "buyer in the ordinary course of business." *See* Act of March 14, 1986, ch. 322, § 2, 1986 Minn. Laws 20, 21 (codified as Minn.Stat. § 336.9–307 (1998)); Act of April 11, 2000, ch. 399, art. I, § 40, 2000 Minn. Laws 569, 610 (codified as Minn. Stat. § 336.9–320 (2004)).[4]

To summarize, under 7 U.S.C. § 1631 a buyer of farm products in the ordinary course of business (1) takes free of security interests created by the seller, unless notice of the seller-created security interest has been given by one of three specific notice procedures, which include the Minnesota central filing system provided under chapter 336A; but (2) takes subject to security interests created by someone other than the seller. Similarly, under Minnesota's version of the UCC applicable at the time of the subject transactions, a buyer of farm products in the ordinary course of business (1) takes free of security ty interests created by the seller, but (2) takes subject to a security interest created by someone other than the seller.

### B. *The Summary Judgment Record.*

With this legal framework in mind, we turn to the undisputed facts in this record. In 1999, Fin Ag made an operating loan of $249,995 to Buck. As collateral for this loan, Buck granted Fin Ag a security interest in Buck's corn crops for 1999. Fin Ag filed UCC financing statements in Hubbard and Wadena Counties (where the crops were grown), but not in Itasca County (where the Bucks resided). Fin Ag also filed an "effective financing statement" with the Minnesota Secretary of State, which caused the security interest to be listed in Minnesota's central filing system. *See* Minn.Stat. § 336A.04 (2004).

Meschke purchased several loads of corn that were produced by Buck. Because Meschke is a registered farm products dealer, he received an electronic copy of Minnesota's listing from the central filing system of sellers whose grain is subject to security interests. *See* Minn.Stat. § 336A.11 (2004). Meschke learned from the central filing system that Buck's corn was subject to a security interest held by Fin Ag. When Meschke bought corn directly from Buck, he generally included Fin Ag's name on the check. But twice Meschke bought corn directly from Buck without making the check payable to both Buck and Fin Ag; the amount of these sales was $7,129.24. Meschke does not dispute Fin Ag's claims with regard to these two payments.

Meschke was also offered corn by persons who claimed that the sellers were,

---

**4.** Following revisions to Article 9 of the UCC, the Minnesota legislature rewrote much of Minnesota's Article 9–based statutes in 2000, at which time section 336.9–307 was repealed and reenacted as section 336.9–320, which again excludes a buyer of farm products from the protection for a buyer in the ordinary course. Act of April 14, 2000, ch. 399, art. 1, §§ 40 (reenactment), 140 (repeal), 2000 Minn. Laws 569, 610, 677.

variously, Mark Tooker, Mickey Buck, Paul Zuk, and Ryan Buck (collectively the Tookers).[5] The Tookers were not listed in the central filing as having corn that was subject to any security interest. Meschke made payment for this corn solely in the names of the Tookers. Meschke bought corn from the Tookers on seven separate occasions and paid a total of $38,443.85. Each of the checks to the Tookers was subsequently deposited into Buck's bank account but was not applied to Buck's debt to Fin Ag.

When Buck failed to repay the Fin Ag loan, Fin Ag sued Meschke for conversion of Fin Ag's collateral in the corn that was involved in the Tooker sales and the two Buck sales. Fin Ag moved for summary judgment against Meschke. Meschke opposed the motion, arguing that he was entitled to take the corn free of Fin Ag's security interest under 7 U.S.C. § 1631 because he did not receive notice of Fin Ag's security interest when he checked the central filing system for the names of the Tookers. The district court granted summary judgment in favor of Fin Ag, awarding damages for the seven Tooker sales and two Buck sales in the amount of $45,573.09, plus costs and interest. The court of appeals affirmed, and we granted Meschke's petition for review.

### I.

■■■ We review a grant of summary judgment to determine whether there are any genuine issues of material fact and whether the district court erred in applying the law to the facts. *Westrom v. Minn. Dep't of Labor and Indus.*, 686 N.W.2d 27, 32 (Minn.2004). We view the evidence in the light most favorable to the party against whom summary judgment was granted. *Hickman v. SAFECO Ins.*

*Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005). Statutory construction is a question of law subject to de novo review. *Vlahos v. R & I Constr. of Bloomington, Inc.*, 676 N.W.2d 672, 679 (Minn.2004).

The record submitted in connection with Fin Ag's motion for summary judgment does not fully explain the circumstance under which the Tookers became involved with the sales to Meschke. Conceivably, the Tookers could have been involved in any one of three capacities: (1) as agents selling on behalf of Buck as an undisclosed principal; (2) as "commission merchants" or "selling agents," defined terms under 7 U.S.C. § 1631(c)(3, 8) (2000); or (3) as owners of the corn, selling on their own behalf. Although there may be genuine issues of fact concerning which of those three capacities applies to the sales to Meschke, Fin Ag argues that those issues of fact are not material, and do not preclude summary judgment, because Meschke would take the corn subject to Fin Ag's security interest under each of these alternative capacities.

Fin Ag's argument requires us to consider how section 1631 works in the situation of "fronting" sales. The parties describe "fronting" as being where a seller of farm products that are subject to a security interest has a third party sell them under the third party's name. Here, Meschke bought the corn from the Tookers and, when Meschke checked the central filing system, he found no security interests listed in the Tookers' names. As a result, both Meschke and Fin Ag can be viewed as innocent parties in the sense that they each did everything they were required or expected to do under the FSA.

Meschke advances several policy-based arguments that emphasize how difficult it

---

**5.** Mark Tooker and Paul Zuk were employees of the Bucks. The parties agree that Mickey and Ryan Buck were Ronda and Larry Buck's minor children.

is for a buyer of farm products to discover a security interest in a fronting situation. We recognize that difficulty, but we are constrained to apply the plain language of the statutes, as enacted by Congress and the Minnesota Legislature, and to follow where they lead. The difficulty with those statutes, as highlighted earlier, is that the protection for the buyer is narrowly limited by the clause "created by the seller."

The presence of this limitation in UCC section 9–307 has received much criticism, both from the courts and scholars. *See* William H. Lawrence, *The "Created by His Seller" Limitation of Section 9–309(1) of the UCC: A Provision in Need of an Articulated Policy,* 60 Ind. L.J. 73, 73–74 (1984–85). Yet, all efforts to eliminate or amend this clause have failed since the UCC was rewritten in 1957. *See* Richard H. Nowka, *Section 9–302(a) of Reviewed Article 9 and The Buyer in the Ordinary Course of Pre–Encumbered Goods: Something Old and Something New,* 38 Brandeis L.J. 9, 23–24 (1999–2000). And, as noted, Congress essentially incorporated this clause in section 1631 when it attempted to correct some of the other shortcomings, from the perspective of buyers, of UCC section 9–307.

Neither Congress nor the Commissioners on Uniform State Laws have enunciated a policy reason for this clause.[6] *See*

Nowka, *supra,* at 23. But the Official Comment to section 9–320, when revised and renumbered in 2000, makes it clear that the "created by the buyer's seller" clause is a serious limitation on the rights of buyers in the ordinary course of business, citing this example:

> Manufacturer, who is in the business of manufacturing appliances, owns manufacturing equipment subject to the perfected security interest in favor of Lender. Manufacturer sells the equipment to Dealer, who is in the business of buying and selling used equipment. Buyer buys the equipment from Dealer. Even if Buyer qualifies as a buyer in the ordinary course of business, Buyer does not take free of Lender's security interest under subsection (a) [of section 9–320], because Dealer did not create the security interest; Manufacturer did.

U.C.C. § 9–320, official cmt. 3 (2000), 3 U.L.A. 219–20 (2002).

The inclusion of the "created by the seller" clause in section 1631 means that the statute does not provide protection for buyers in a fronting situation where the security interest from which protection is sought was not created by the fronting parties. Under the facts of this case, no matter what factual assumptions we make, there are none under which Meschke could take the corn free of Fin Ag's security

---

**6.** One commentator suggests the following:

Thus, the policy underlying the "created by his seller" language is to limit the exception to security interest validity codified in section 9–307(1) to cases in which the secured party has clothed the debtor with the indicia of apparent authority to sell the goods. Nonpossessory inventory financing establishes apparent authority in dealer-debtors to sell to buyers in ordinary course because (1) the intended result of inventory financing is sale of the collateral to third persons, (2) the sale is facilitated by entrusting the collateral to dealer-debtors in the business of selling goods of the kind compromising

the collateral, and (3) most of these sales are made pursuant to actual secured party authorization. Debtor sales of consumer goods and equipment are distinguishable. Improper sales of these categories of collateral generally do not occur, nor are they expected to occur; therefore, secured parties have been relieved of the burden of policing such sales. The absence of apparent authority to sell is the justification for continuing the validity of the security interest in such situations even against a buyer in ordinary course of business.

Lawrence, *supra,* at 87.

interest. This is because if we view Buck as the seller, we must conclude that Meschke's rights are subject to Fin Ag's security interest under section 1631 because Fin Ag filed an "effective financing statement" that put Meschke on notice of Fin Ag's security interest in Buck's products. And, if we view the Tookers as the sellers, we must conclude that Meschke's rights are subject to Fin Ag's security interest, under either section 1631 or Minnesota's UCC, because both statutes only protect a buyer from a security interest created by the seller and not from a security interest created by an undisclosed owner, which continues in the product despite the sale.

## II.

We first analyze the transactions under 7 U.S.C. § 1631. As noted, the rule under section 1631 is that a qualified buyer takes free of a security interest "created by the seller." 7 U.S.C. § 1631(d). Thus, the first question is who was Meschke's "seller." Section 1631 does not define "seller." See 7 U.S.C. § 1631(c). Under our facts, Meschke's "seller" could be either Buck (as the undisclosed principal of the sale) or the Tookers (as those who were identified as the sellers when the transactions occurred). But we need not resolve that ambiguity because neither alternative would allow Meschke to take the corn free of Fin Ag's security interest under section 1631.

The court of appeals treated Buck as the seller, concluding that Buck had constructive possession of the corn and Meschke

had constructive knowledge of Fin Ag's security interest in Buck's corn. We doubt that constructive notice or constructive knowledge are viable concepts under section 1631, but we need not reach that issue. If we consider the application of section 1631 under each alternative—with either Buck as the seller or the Tookers as the sellers—we come to the same conclusion.

■ If we view Buck as the seller, assuming that the Tookers sold the corn as agents for Buck as an undisclosed principal, the exception in section 1631(e) for a security interest as to which notice has been given would apply because Meschke received notice of Fin Ag's interest against Buck, and Meschke did not secure a waiver of the interest from Fin Ag. See 7 U.S.C. § 1631(e)(3). Accordingly, Meschke's interest in the corn would be subject to Fin Ag's security interest. See id.

■ If we treat the Tookers as the sellers, assuming that the Tookers sold the corn on their own behalf, we need to consider whether they sold the corn as a "commission merchant" or as "selling agents," as defined by section 1631, or as owners, having taken title to the corn (by purchase or gift).

If the Tookers sold the corn as "commission merchants" or as "selling agents," [7] section 1631 provides that such a merchant or agent is subject to the security interest created by the seller if the "commission merchant or selling agent has failed to register with the Secretary of State" and the "secured party has filed an effective

---

7. A "commission merchant" is defined as "any person engaged in the business of receiving any farm product for sale or commission, or for or on behalf of another person." 7 U.S.C. § 1631(c)(3) (2002). A "selling agent" is defined as "any person, other than a commission merchant, who is engaged in the business of negotiating the sale and purchase of any farm product on behalf of a person engaged in farming operations." 7 U.S.C. § 1631(c)(8) (2002). The Tookers could qualify as one or the other, depending on the terms under which they made the sale for Buck, if they were in the business of making/receiving products for sale, or of making such a sale.

financing statement that covers the farm products being sold" in a state that has a central filing system. 7 U.S.C. § 1631(g)(2)(C). There is no evidence that the Tookers registered as commission merchants or as selling agents.

If the Tookers took title to the corn and sold to Meschke on their own behalf, they would have taken title subject to Fin Ag's security interest because Fin Ag filed an effective financing statement with the Secretary of State and there is no evidence that the Tookers registered with the Secretary of State. *See* 7 U.S.C. § 1631(e)(2). And if the Tookers took title to the grain subject to Fin Ag's security interest, their sale to Meschke would only be free of any security interest created by the Tookers, and would be subject to Fin Ag's security interest because it was created by Buck. *See* 7 U.S.C. § 1631(d).

Thus, if the transaction is governed by section 1631 and we consider all of the factual scenarios possible on this record, we must conclude that Meschke took the corn subject to Fin Ag's security interest.

The only other possible analysis that could be made is to assume that the transfer of possession by Buck to the Tookers transformed the corn from a "farm product," covered by section 1631, to "inventory," not covered by section 1631. Because that analysis is not made under section 1631, we will discuss it under the analysis of the UCC below. *See* 7 U.S.C. § 1631(c)(5).

### III.

█ It is possible that the corn ceased being a "farm product" and became "inventory" after it was acquired from Buck to the Tookers. *See, e.g., United States v. He* xt, 444 F.2d 804, 813–15 (5th Cir.1971) (holding that the sale of cotton by a farmer to his wholly owned ginning company meant that the cotton became inventory

and was no longer a farm product); *Baker Prod. Credit Ass'n v. Long Creek Meat Co., Inc.,* 266 Or. 643, 513 P.2d 1129, 1132 (1973) (holding that, after slaughtering, cattle were no longer "farm products" but inventory); *First Bank of N.D. v. The Pillsbury Co.,* 801 F.2d 1036, 1038–39 (8th Cir.1986) (holding that the sale of grain by a farmer to his wholly owned elevator company converted the grain from a farm product to inventory). If so, a subsequent sale by the Tookers to Meschke would be governed by Minn.Stat. § 336.9–307 (1998), not section 1631, which only applies to "farm products." But the result would be the same because Minn.Stat. § 336.9–307 (1998), like section 1631, provides no protection for security interests not "created by the seller."

Meschke argues that the burden of hidden liens should be on the lender, who has an "ongoing relationship with the debtor" and is "able to monitor the debtor's activities, including sales through intermediaries." Meschke relies on the Eighth Circuit decision in *First Bank,* 801 F.2d at 1038, for the proposition that, because lenders know that the goods they are financing may become inventory that will be purchased by innocent buyers in the ordinary course of business, the risk of such transactions should be placed on the lenders. Although we recognize the policy considerations that underlie Meschke's argument, we are constrained to conclude that the Minnesota Legislature has made other policy choices. As a result, we conclude that *First Bank* does not constitute good law, at least under Minnesota's version of the UCC.

*First Bank* involved a situation where the farmer sold grain in which the bank had a security interest to a grain elevator that the farmer owned but did not operate. *First Bank,* 801 F.2d at 1037. The grain elevator then commingled the grain with

other grain, and sold a portion of the commingled grain to Pillsbury. *Id.* The farmer and the grain elevator later went bankrupt, and the bank sued Pillsbury for conversion of the bank's collateral. *Id.* at 1037–38. The North Dakota UCC was the applicable law and it provided: "A buyer in the ordinary course of business * * * other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller." *Id.* at 1038 (quoting N.D. Cent.Code § 41–09–28(1) (1983)). The Eighth Circuit first concluded that the grain was not a "farm product" in the sale between the grain elevator and Pillsbury by treating the elevator as a separate legal person who was not engaged in farm operations and thus was selling "inventory" that had lost its character as a farm product. *Id.* But, for purposes of applying the "created by his seller" limitation, the Eighth Circuit treated the farmers as the sellers, stating:

> In our case, it is clear that the elevator was the marketing agency for the [farmers]. Because the [farmers] were the owners of the elevator, and this fact was well known to the bank, we find that the lien was in fact and in law created by Pillsbury's seller.

*Id.* at 1040.

In sum, for the purposes of the "created by his seller" limitation, the Eighth Circuit considered the farmers to be "the seller" because they owned the grain elevator, but for the purposes of the "farm product" exclusion, the Eighth Circuit considered the separately incorporated grain elevator to be "the seller." *Id.* at 1038, 1040. The Eighth Circuit relied on *Hext*, 444 F.2d 804. *First Bank*, 801 F.2d at 1038, 1040. One commentator supports the analysis made in *Hext* arguing:

> Severance of the security interest under this analysis appears to depend on an

inconsistent manipulation of the agency status of the auctioneer. On one hand, the agency relationship removes the collateral from the farmer's control so as to convert it from farm products into inventory. On the other hand, the agency relationship relates the collateral back to the farmer in order to avoid the created-by-his-seller limitation. Even if manipulation of the agency concept were the basis of the argument, this would not constitute a dispositive criticism in light of the desirability of the result, as well as the inherent flexibility and remedial nature of agency doctrine. In fact, the solution results directly from the Code's system of collateral classification which allows property to change categories. Since the present transformation—from farm products to inventory—follows from a change in possession, it fully comports with the pervasive Article 9 policy of keying alterations of property rights to observable physical events. Under this approach, the courts can still control collusive practices by reference to the prerequisites of buyer-in-the ordinary-course status.

Robert Dugan, *Buyer–Secured Party Conflicts Under Section 9–307(1) of the Uniform Commercial Code,* 46 U. Colo. L.Rev. 333, 355–56 (1975). But another commentator criticizes the *Hext* analysis stating:

> The court in *Hext* failed to distinguish that the security interest was created by the farmer and not the seller. That the court was willing to look past this fact indicates a blatant bias towards buyers of farm products and portrays a type of judicial circumvention which is used to avoid the farm products exception.

Wolfe, *supra,* at 480 n. 183.

We cannot follow the Eighth Circuit down a path that would require us to define seller two different ways in the same analysis without a significant indica-

tion that this was the legislature's intent. No such indication exists here. Accordingly, if we examine the transactions under the UCC, we must conclude that Meschke took the corn subject to Fin Ag's security interest.

## IV.

■ As an alternative argument, Meschke points out that Fin Ag did not file its financing statement in the correct county, and claims that the security interest therefore was not perfected. Fin Ag argues that, while it did not file in the correct county, its security interest was still perfected under the "good faith" exception to the filing rule.

To perfect a security interest, the lender must file a UCC–1 financing statement. *See* Minn.Stat. §§ 336.9–302, 336.9–401 (1998). Under Minnesota law as it existed in 1999, the required place of filing depended on the nature of the collateral as well as the identity and residence of the debtor. *See* Minn.Stat. § 336.9–401 (1998). For crops, the lender was required to file its UCC–1 financing statement in the county of the debtor's residence. Minn. Stat. § 336.9–401(1)(b) (1998). But, if the lender has filed in an incorrect place, or in fewer than all of the required locations, the security interest can still be considered effective if the filing satisfied a good faith exception:

> A filing which is made *in good faith* in an improper place or not in all of the places required by this section is nevertheless effective with regard to any collateral as to which the filing complied with the requirements of this article and *is also effective* with regard to collateral covered by the financing statement *against any person who has knowledge of the contents of such financing statement.*

Minn.Stat. § 336.9–401(2) (1998) (emphasis added).

Although Fin Ag did not file its financing statement in the correct county, it fulfilled the terms of the good faith exception because it is undisputed that Meschke knew of Fin Ag's security interest in Buck's farm products from the electronic listing of Minnesota's central filing system, which he had actually accessed. Meschke had made checks payable to both Fin Ag and Buck for some of the corn sold directly by Buck, based on the information provided to Meschke from the central filing system. Thus, Fin Ag's security interest was effective against Meschke.

Affirmed.