#24050-rev & rem-SLZ

**2008 SD 49**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

FIN-AG, INC.,                                           Plaintiff and Appellee,

  v.

WATERTOWN LIVESTOCK
AUCTION, INC.,                                          Defendant and Appellant.

and

DACOTAH BANK,                                          Defendant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE ROBERT L. TIMM
Judge

* * * *

JASON W. SHANKS of
May & Johnson, PC
Sioux Falls, South Dakota

and

JONATHAN K. VAN PATTEN
Vermillion, South Dakota                               Attorneys for appellee.

MICHAEL A. HENDERSON of
Cadwell, Sanford, Deibert
& Garry, LLP
Sioux Falls, South Dakota                              Attorneys for appellant.

* * * *

ARGUED JANUARY 8, 2007

OPINION FILED **06/18/08**

#24050

ZINTER, Justice

[¶1.]     This appeal arises from an action for conversion by Fin-Ag, Inc. against Watertown Livestock Auction, Inc. Fin-Ag alleges it had a perfected security interest in cattle sold at Watertown under the name C&M Dairy. The case involves numerous issues regarding a commission merchant's liability for conversion when the collateral involves farm products covered by the Food Security Act (FSA), 7 USC § 1631 (1985). On cross-motions for summary judgment, the circuit court concluded that Watertown converted Fin-Ag's collateral.

[¶2.]     This case involves the same debtors[1] and creditor, and the same type of cattle sales considered in Fin-Ag, Inc. v. Cimpl's, Inc., 2008 SD 47, __NW2d __; Fin-Ag, Inc. v. Pipestone Livestock Auction Market, Inc., and Fin-Ag, Inc. v. South Dakota Livestock Sales of Watertown, Inc., 2008 SD 48, __NW2d ___. In fact, the circuit court's memorandum decision in *Fin-Ag, Inc. v. South Dakota Livestock Sales of Watertown* was the basis for the circuit court's decision in this case. Because we considered the same core issues[2] involving virtually identical transactions in the prior cases, we reverse and remand this case for further proceedings in accordance with those decisions.

---

1.    Berwalds includes the following persons and entities: Calvin Berwald, Michael Berwald, Kimberly Berwald, Berwald Brothers (a general partnership including Calvin and Michael Berwald as general partners), and Sokota Dairy, LLC.

2.    Watertown Livestock raises one additional argument under the Packers and Stockyards Act, 7 USC § 181, attempting to distinguish *Consolidated Nutrition, L.C. v. IBP, Inc.*, 2003 SD 107, 669 NW2d 126. We decline to review that argument because it was not presented to the circuit court.

#24050

[¶3.]     GILBERTSON, Chief Justice, and MEIERHENRY, Justice concur.

[¶4.]     SABERS and KONENKAMP, Justices, dissent in part and concur in part.

SABERS, Justice (dissenting on all Fin-Ag cases on the FSA issue).[3]

[¶5.]     Incredibly, Fin-Ag presents this Court with authority from a neighboring state that is virtually on point to the circumstances of this case; yet, the opinion goes out of its way at every opportunity in its analysis of the issues to arrive at the opposite conclusion of the *Hufnagle* case. Because I cannot agree with the opinion's analysis and conclusions regarding FSA protection, I dissent.

[¶6.]     In *Hufnagle*, the lender, Fin-Ag had a perfected security interest in Buck's corn crops. 720 NW2d 579, 580 (Minn 2006). Fin-Ag also filed an effective financing statement, "which caused the interest to be listed in Minnesota's central filing system." *Id.* Meschke was a registered farm products dealer and he received the central filing system's list of sellers whose grain was encumbered by security interests. *Id.* When Meschke bought corn directly from Buck he, with two exceptions, made the checks payable to Buck and Fin-Ag jointly. *Id.*

---

3.     As the opinion acknowledges, this case is similar to Fin-Ag, Inc. v. Cimpl's, Inc., 2008 SD 47, __ NW2d __ and Fin-Ag, Inc. v. Pipestone Livestock Auction Market, Inc., and Fin-Ag, Inc. v. South Dakota Livestock Sales of Watertown, Inc., 2008 SD 48, __ NW2d __. Because these cases are closely related and should be read together, it necessitates that I restate the underlying flaw in the FSA analysis stated in *Cimpl's*, 2008 SD 47, ¶¶10-47, __ NW2d __, and perpetuated here.

[¶7.] Later, Meschke bought corn from persons, the Tookers, who claimed they were the sellers. *Id.* at 583-84. There was no one by the name Tooker on the central filing system list. *Id.* Meschke bought corn from the Tookers seven different times. *Id.* The proceeds from these seven transactions were deposited in the debtor's (Buck's) account. *Id.* Fin-Ag was not made a co-payee on any of these checks. *Id.*

[¶8.] Fin-Ag sued Meschke for conversion after Buck failed to repay Fin-Ag. *Id.* The Minnesota district court granted summary judgment in favor of Fin-Ag. *Id.* On appeal, the Minnesota Court of Appeals affirmed. *Id.*

[¶9.] The Minnesota Supreme Court held Meschke was liable for conversion. *Id.* at 581. In doing so, it noted that it must determine "how section 1631 works in the situation of 'fronting' sales. The parties describe 'fronting' as being where a seller of farm products that are subject to a security interest has a third party sell them under the third party's name." *Id.* at 584. The court recognized that "both Meschke and Fin-Ag can be viewed as innocent parties in the sense that they each did everything they were required or expected to do under the FSA." *Id.*

[¶10.] The buyer, Meschke, made arguments that are similar to the Sale Barns' arguments in this case. For instance, Meschke argued that it is difficult for a buyer of farm products to discover a security interest in a fronting situation and lenders are better suited to police these situations. Sale Barns advanced a virtually identical argument.

[¶11.] Despite this argument, and the recognition of the difficulty a fronting situation presents for a buyer, the Minnesota Supreme Court found it was

"constrained to apply the plain language of the statutes, as enacted by Congress and the Minnesota Legislature, and to follow where they lead." *Id.* at 585. The court noted that the "created by the seller" language was a serious limitation on the FSA's protections afforded to the buyer. Moreover, the language has come under much criticism, but Congress "essentially incorporated this clause in section 1631 when it attempted to correct some of the other shortcomings, from the perspective of buyers, of UCC section 9-307." *Id.*

[¶12.] Due to this limitation, Meschke could not find protection, even in the fronting situation and even though he was an innocent buyer. The court noted:

> The inclusion of the "created by the seller" clause in section 1631 means that the statute does not provide protection for buyers in a fronting situation where the security interest from which protection is sought was not created by the fronting parties. *Under the facts of this case, no matter what factual assumptions we make, there are none under which Meschke could take the corn free of Fin Ag's security interest.* This is because ***if we view Buck as the seller***, we must conclude that *Meschke's rights are subject to Fin Ag's security interest* under section 1631 because Fin Ag filed an "effective financing statement" that put Meschke on notice of Fin Ag's security interest in Buck's products. And, ***if we view the Tookers as the sellers***, we must conclude *that Meschke's rights are subject to Fin Ag's security interest*, under either section 1631 or Minnesota's UCC, *because both statutes only protect a buyer from a security interest created by the seller and not from a security interest created by an undisclosed owner*, which continues in the product despite the sale.

*Id.* at 586 (emphasis added). Here, the same result is required, if we view Calvin and Michael Berwald as the seller, then Sale Barns' rights are "subject to Fin-Ag's security interest under section 1631" because Fin-Ag filed an 'effective financing statement' that put [Sale Barns] on notice . . . ." *Id.* Alternatively, if we view C&M

Dairy as the seller, then "we *must* conclude that [Sale Barns]' rights are subject to Fin-Ag's security interest" because under section 1631, a buyer is only protected "from a security interest created by the seller and not from a security interest created by an undisclosed owner." *See id.*

[¶13.] Instead, the opinion distinguishes *Hufnagle* by declaring "fronting" different than using a d.b.a.[4] It rationalizes that the *Hufnagle* court did not "consider the fourth factual scenario that is before this Court, i.e., debtors who created the security interest, and conducted their business under their d.b.a. business name." *See* Fin-Ag v. Cimpl's, 2008 SD 47, ¶31, __ NW2d __. However, when discussing if C&M Dairy can be a seller under the FSA, the opinion declares that C&M Dairy is an "other business entity," separate and distinct from the Berwalds. *Id.* ¶23 (quoting 7 USC § 1631(c)(10). The use of a separate and distinct entity to sell cattle subject to a different owner's security interest is factually analogous to *Hufnagle*, and *is* fronting. As the Minnesota Supreme Court noted, "[t]he corn [cattle] had been sold to Meschke [Sale Barns] in the names of third persons [separate entity, C&M Dairy] not involved with the debt to Fin-Ag." *Hufnagle*, 720 NW2d at 580. This issue should be decided based on the rationale expressed in *Hufnagle*.

---

4. The opinion attempts to distinguish the *Hufnagle* case by explaining a fronting situation only occurs when a separate third person sells the product. However, what about the deliveries where Austin, Arlen, a semi-driver or some other unidentified person delivered cattle to the sale barns? Are these not third persons? Or are we to consider anyone who delivers cattle for C[alvin] & M[ichael] Dairy a part of that fictitious entity?

[¶14.] The opinion can call it anything it wants, but it cannot hide what is plain and obvious. In its attempts to decide this case in favor of the Sale Barns, it arrives at some conflicting conclusions. For example, the opinion concludes that C&M Dairy is a "business entity" and therefore separate from Calvin and Michael Berwald and can be a seller under the statute, thus the FSA protects Sale Barns. Then, in the next portion of analysis, C&M Dairy is merely a d.b.a. and cannot be separated from the Berwalds, therefore C&M Dairy created the security interest and again, Sale Barns win. In reality, C&M Dairy is an illegal fiction and definitely a fronting situation. It is not an entity or an alter ego – and certainly not both the "seller" and the "seller who created the security interest."

[¶15.] There are two different interpretations of a supposed entity, yet the same strained outcome. When defining "seller," it is inconsistent to say that in one instance C&M Dairy is an entity distinct from the Berwalds, so C&M Dairy can be the seller and claim Sale Barns did not receive notice of Fin-Ag's security interest, and then to say the Berwalds and C&M Dairy are "one and the same" in order to find C&M Dairy is the "seller who created the security interest." In *Hufnagle*, the Minnesota Supreme Court specifically refused to "define seller two different ways in the same analysis without a significant indication that this was the legislature's intent. No such indication [of legislative intent] exists here." 720 NW2d at 588-89. We should not interpret seller two different ways.

[¶16.] We certainly should not interpret seller two different ways when many commentators have criticized the limitation "created by the seller" in the context of 9-307, yet the clause has never been amended or eliminated since the UCC was

rewritten in 1957. *Hufnagle*, 720 NW2d at 585 (citing William H. Lawrence, *The "Created by His Seller" Limitation of Section 9-309(1) of the UCC: A Provision in Need of an Articulated Policy*, 60 Ind. L.J. 73, 73-74 (1984-1985) and Richard H. Nowka, *Section 9-302(a) of Reviewed Article 9 and The Buyer in the Ordinary Course of Pre-Encumbered Goods: Something Old and Something New*, 38 Brandeis L.J. 9, 23-24 (1999-2000)). Significantly, despite its criticisms, Congress included this clause in section 1631 of the FSA in 1985 when attempting to correct some of the other problems of buying food products under the UCC. *See supra* ¶11 (Sabers, J., dissenting) (citing *Hufnagle,* 720 NW2d at 585).

[¶17.]    White and Summers have discussed the difficulties with the "created by the seller" language. *See* 4 White & Summers, Uniform Commercial Code § 33-13 (4th ed 1995 & Supp 2007) (discussing the problems produced by the created by the seller language in former UCC § 9-307). Importantly, they theorize that: "Perhaps the drafters intended that as between two innocent parties the ultimate loss should fall on the party who dealt most closely with the 'bad guy.'" *Id.* Although this may conflict with the FSA policy, we have to presume that Congress knew what it was doing when it borrowed this language from the UCC.

[¶18.]    In each of the cases here,[5] the Sale Barns knew they were dealing with Calvin or Michael Berwald, or both, before they were dealing with "C&M Dairy." Calvin Berwald is the "C" and Michael Berwald is the "M" and the Sale Barns knew

---

5.    Cimpl's may not have known C&M Dairy as Michael and Calvin Berwald specifically; however the deliveries were made by Austin, Calvin, Michael, or Arlen Berwald. The other sale barns had received deliveries of cattle from Michael and Calvin Berwald in the past as well.

it, and they should suffer the ultimate loss. The Sale Barns either took a "head in the sand" approach and let the Berwalds tell them who they were acting as, or they simply decided that even though Berwald and family were listed in the master list, if the Berwalds chose to call themselves something else not mentioned on the list, the Sale Barns took the position they had to go strictly with the list.[6] In this case, the decision to go with C&M Dairy as the seller was self-serving, as it allowed the sale barn to collect on a past debt. *See* Fin-Ag v. Watertown Livestock, Brief of Appellee at 4, 2008 SD 49, __ NW2d ___ (No. 24050). In sum, these Sale Barns were more closely dealing with the "bad guy."[7]

---

6.  Either way, when compared to *Hufnagle*, these facts make it a much stronger case for Fin-Ag to prevail because in *Hufnagle*, the buyer was not dealing with the owner/debtor, Buck, but was dealing with completely unrelated sellers, the Tookers. Here, Sale Barns dealt solely with the Berwalds simply using an unregistered, fictitious name. The Sale Barns knew they were dealing with the Berwalds fronting as C&M Dairy. Once again, it is not rocket science that the "C" in C&M Dairy stands for Calvin Berwald, and the "M" in C&M Dairy stands for Michael Berwald, especially when they or their father, Arlen Berwald, delivered the cattle.

7.  Under South Dakota Law, it is not only a crime to sell mortgaged property without the mortgagee's consent, *see* SDCL 44-1-12, it is also a crime under SDCL 37-11-1, for any person to engage in or conduct a business for profit in South Dakota "under any name which does not plainly show the *true surname* of each person interested in such business unless a statement is filed first." (Emphasis added). Furthermore, South Dakota has had a fictitious name certificate statute for at least sixty-nine years. The fictitious name certificate must be filed in the register of deeds office or secretary of state's office. Penalties are provided for failure to file and it constitutes a misdemeanor.

    Although these issues were not raised in the briefs, the Sale Barns are "presumed to know the law" and should not benefit from two separate violations of the criminal law.

[¶19.] It does not end there. Again, in an attempt to distinguish *Hufnagle*, the opinion indicates that *Hufnagle* "appeared to involve collusion on the part of the buyer." *Cimpl's*, 2008 SD 47, ¶33, __ NW2d __. Never mind the fact that the Supreme Court of Minnesota did not rely on that specific fact in its analysis and it is not relevant to the discussion. It merely seeks to cloud the real issues. Indeed, the court noted that "no matter what factual assumptions we make, there are none under which Meschke could take the corn free of Fin Ag's security interest." *Id.* at 586.

[¶20.] The opinion's analysis of this issue in *Cimpl's*, 2008 SD 47, ¶¶10-47, __ NW2d __, incorporated by reference here, *see supra* ¶2, sends the message to deceitful debtors that they can avoid the security interest if they use their initials as a fictitious name to sell their collateral to sale barns. That opinion blindly accepts the answer of the driver of the cattle truck to the yardman that the seller is "C&M Dairy," even if the driver of the truck is Calvin Berwald, Michael Berwald or their Father, Arlen Berwald. Interpreting the statutes in this manner produces the exact result we should prohibit – absurd. That opinion claims the burden should be on the lender, the party who is more capable of policing this problem. However, it seems it would be next to impossible for a lender to prevent its debtor from creating a fictitious name, with no fictitious name filing, and selling cattle under that name, while it would be relatively easy for the Sale Barn to dig past the fictitious name and inquire as to the proper owner and seller of the cattle.

[¶21.] Finally, the opinion in *Cimpl's*, 2008 SD 47, __ NW2d __, thoroughly discusses the background of the enactment of the FSA. It details the overarching

theme of protecting buyers from the threat of double payment. Then, that opinion finds the statute ambiguous, because seller is not defined, and declares that we must use the policy behind the act to interpret the statute. *See Cimpl's*, 2008 SD 47, ¶20, __ NW2d __. Thus, according to that opinion, we must interpret the statute to favor the Sale Barns.

[¶22.] However, failure to define a term does not automatically result in an ambiguity. Jackson v. Canyon Place Homeowner's Ass'n, 2007 SD 37, ¶11, 731 NW2d 210, 213 (citing Halls v. White, 2006 SD 47, ¶8, 715 NW2d 577, 581). Moreover, we consistently only use the plain language of the statute and never examine the policy or legislative history unless the text is ambiguous. "Resorting to legislative history is justified only when legislation is ambiguous, or its literal meaning is absurd or unreasonable. Absent these circumstances, we must give legislation its plain meaning. We cannot amend [the statute] to produce or avoid a particular result." *In re* Estate of Howe, 2004 SD 118, ¶41, 689 NW2d 22, 32 (quoting Slama v. Landmann Jungman Hosp., 2002 SD 151, ¶7, 654 NW2d 826, 828 (quoting Petition of Famous Brands, Inc., 347 NW2d 882, 885 (SD 1984))); *see also In re* Estate of Olson, 2008 SD 4, ¶38, 744 NW2d 555, 566; Jensen v. Turner County Bd of Adjustment, 2007 SD 28, ¶5, 730 NW2d 411, 413; Goetz v. State, 2001 SD 138, ¶16, 636 NW2d 675, 681; Reider v. Schmidt, 2000 SD 118, ¶9, 616 NW2d 476, 479. As Judge Timm noted, "[t]he FSA is not ambiguous, and the seller using a different name does not create an ambiguity in the language of the statute." We should interpret seller consistently. If interpreted consistently and using the plain language of the statute, the Sale Barns are not protected by the FSA. It takes an

#24050

owner or someone with interest in the property to create a security interest. If Congress meant a fiction or a front instead of the word seller, it would have said so.

[¶23.] There is a scarcity of authority on this issue. We should refuse to engage in statutory interpretation that so heavily favors the Sale Barns to a lender's disadvantage without a clear directive from Congress to do so. The rationale and holding set forth in *Hufnagle* should be the law of South Dakota.

In summary:

Watertown (#24050) -

1. I would affirm Judge Timm on the FSA seller issue for the reasons stated in my writing.

2. However, because Judge Timm granted summary judgment on the conversion issue and because there are many genuine issues of material fact (as discussed in Justice Zinter's writing), we must reverse and remand this issue.

3. Genuine issues of material fact also exist on the damage questions raised in Justice Zinter's writing in *South Dakota Livestock/Pipestone*, 2008 SD 48, __NW2d __ (#23982, #24001; #23984) and we must reverse and remand for trial.

[¶24.] KONENKAMP, Justice, joins this dissent.